UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| DREW MORGAN and MARY HARGIS, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:17-cv-00060-GFVT |
| | ) | |
| v. | ) | |
| | ) | **OPINION** |
| MATT G. BEVIN, in his official capacity as | ) | **&** |
| Governor of Kentucky, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

Since 1791, we have given voice to a national value in favor of protecting robust political discourse in the words and promise of the First Amendment to the Constitution. This case requires the Court to test that value in an age in which citizens have never had more platforms to speak. Voice is no longer measured in only parchment or paper or access to the airwaves but also in the exponential potential of the internet.

Here, internet speakers want to use private internet platforms (Twitter and Facebook), used by the Governor to express his views and opinions as Governor, to force him to listen to their views. He might be wise to do so, but since a "person's right to speak is not infringed when government simply ignores that person while listening to others," *Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 286 (1984), the Governor is not required to do so. That is why Plaintiffs are unlikely to succeed on the merits of this case and consequently their Motion [R. 3] is **DENIED**.

# I

## A

Governor Bevin maintains official Facebook and Twitter accounts. *See* Governor Matt Bevin (@GovMattBevin), FACEBOOK (March 15, 2018), https://www.facebook.com/GovMattBevin/; @GovMattBevin, TWITTER (March 15, 2018), https://twitter.com/govmattbevin?lang=en. Governor Bevin and his staff created these official accounts "in order to communicate [Bevin's] vision, policies, and activities to constituents and receive feedback from them on the specific topics that he chooses to address in his posts." [R 11 at 3.] Governor Bevin asserts neither his official Facebook nor Twitter accounts were ever meant to be an "open forum for general discussion of all issues by the public." [*Id.*]

Plaintiffs allege, and Governor Bevin does not deny, that he has "banned" them from Facebook and "blocked" them on Twitter.[1] [R 1 at 1.] Plaintiff Drew Morgan is a citizen of Kentucky and was blocked by Governor Bevin on Twitter after making comments regarding Governor Bevin's then-overdue property taxes. Mary Hargis is a citizen of Kentucky and was blocked by Governor Bevin on Facebook after criticizing his right-to-work policies. Plaintiffs state that their First Amendment rights are being violated because they cannot comment on Facebook or view the posts and comments of others on Twitter. They seek a declaration that this ban is unconstitutional. [*Id.* at 2.] Plaintiffs further seek preliminary and permanent injunction preventing Governor Bevin from blocking anyone in the future and restoring not only their accounts but also the accounts of other similarly situated individuals. [*Id.*]

Twitter is a privately owned social networking site where users post messages of up to one

---

[1] As the expert noted, both block and ban were used correctly interchangeably throughout the evidentiary hearing. For clarity, this Court will use the word "block" for both Twitter and Facebook. [*See* R. 23 at 32.]

hundred forty (140) characters. [*See* R. 23 at 37.] Individuals can post or tweet their own messages on their own wall or they can "interact with other people's tweets by either commenting on them, re-tweeting them, which is sharing, liking them, or direct messaging users." [*Id.* at 41.] Twitter is different from Facebook, which is also privately owned, because users post on their own walls and engage "other users by using the at symbol [] in front of their name . . . [which] notifies that person that you're talking to them." [*Id.* at 45.] Comments are viewed by clicking on the original tweet. [*Id.* at 42.]

Relevant here, Twitter discourages "violent threats, whether they're direct or indirect, harassment, hateful conduct, multiple account abuse, disclosing private information . . . [and] impersonation of others." [*Id.* at 39.] More specifically, Twitter discourages multiple accounts that have "overlapping uses" or are created "in order to evade the temporary or permanent suspension of a separate account." [R. 23 at 40.] Twitter's moderation functions allow individual users to "mute" certain words so that those words do not show up when that user is using Twitter, but others can still see those words. [*Id.* at 43-44.] This might be used when a parent doesn't want their child to see profanity while logged on to Twitter. [*Id.*] Users can also "report specific tweets," which will alert Twitter to determine if that tweet is appropriate or not. [*Id.* at 46.] When reporting a tweet, Twitter prompts the user to mute or block the account. [R. 23 at 48.] Twitter then views the tweet and can "temporarily ban the user" or "delete the tweet." [*Id.*] Users can also block other users from seeing their page altogether. [*Id.* at 49.] When a user is blocked, they cannot see the page they are blocked from, but instead see a message telling them they are blocked. [*Id.* at 48.] Users can circumvent this by logging out of Twitter "and viewing that page as an unregistered user." [*Id.* at 49.] An unregistered user "can see the page and the different posts, along with some of the comments. . . . [T]hey can't actually interact with anything. They

3

can't post, they can't like, they can't share because they're not logged in." [R. 23 at 49.]

"Facebook is an online social media platform that allows users to create their own individual user profiles for the purpose of connecting and interacting with others." [R. 1 at 4.] A user profile "typically consists of a picture of the individual," a banner image, and a wall where individuals can post textual content or share pictures, videos, and other media. [R. 23 at 17.] Individuals can react to others' posts, indicating they "like it, agree with it, love it, hate it," etc. and can comment on that post or share it with their own followers. [*Id.* at 20.] Individuals also can comment or reply on posts and then react or comment on their own or others' comments or replies. [*Id.* at 21.]

Facebook's terms of service indicate that users should have only one personal account, but businesses and elected officials may also make Pages. [*Id.* at 16.] A Page is similar to a user profile, with a few exceptions; it can have more than one administrator and has some additional rules and functionality. [*Id.* at 19.] Also, a Page is public, unlike an individual user profile. [R. 23 at 22.] Pages have certain built-in moderation capabilities that can automatically block as spam comments containing user-identified words. [*Id.* at 23.] Comments that contain words meant to be filtered out are placed in a spam folder and later can be manually published by a Page's administrator. [*Id.*] Additionally, a Page administrator can set up a profanity filter through Facebook at an off, moderate, or strong setting. [*Id.* at 26.] Page administrators also can manually hide comments that they do not want to be displayed on a Page. [*Id.*] If a comment is hidden, the original commenter can see their comment, the moderator can see their comment, the original commenter's friends can sometimes see the comment, but no one else on the Page can. [R. 23 at 16; R. 23 at 52.] A Page administrator can delete a comment or post; when a comment or post is deleted, it's gone completely and there is no record of its existence. [*Id.* at 28.] A Page

administrator can also report comments to Facebook, who can delete the comment or post if they find it does not abide by their guidelines. [*Id.* at 29.] Facebook notifies the individual who has been reported if their post or comment is deleted and may suspend their account if they find the conduct egregious. [*Id.* at 30.] Individuals can also report entire user accounts. [*Id.*]

Page administrators can block individuals from their Page, which prevents "them from interacting with the [P]age moving forward. They can still see the [P]age, they can still view it, [] they . . . can't comment;" but they can share posts on their own timeline. [R. 23 at 31, 32.] When a user shares a post from a Page, they can add their own comment to the post, which will display on their own account. [*Id.* at 55.] Page administrators can also disable private messages being sent to the Page. [*Id.* at 55.] An individual who has been blocked by a user could circumvent that block by accessing it through a Page they administrate. [*Id.* at 58.] For example, an individual blocked by Governor Bevin could not access his Page through their own personal account, but they could create a Page and then access Governor Bevin's Facebook Page through their own Page. [*Id.*] Also, nothing prevents blocked individuals from closing down or deleting their accounts and creating new personal accounts, thereby circumventing the block and renewing their access to Governor Bevin's Facebook Page. [R. 23 at 61.]

Governor Bevin has set up his Facebook Page so that members of the public cannot post on their own to his timeline, but can only respond to what he has posted. [R. 11 at 3.] Governor Bevin has further limited the public's ability to interact with his Page by setting up automatic filters on comments that contain "certain words, such as expletives and key words that most commonly appear in off-topic comments and spam." [*Id.* at 4.] Governor Bevin's Office controls the key words used in this filter. [*Id.*] Also, "Governor Bevin's Office enforces a policy of disallowing comments that are obscene, abusive, clearly off topic, or spam," and deletes or hides

5

comments that do not abide by the guidelines. [*Id*.] If members of the public continue to make off-topic or obscene comments, Governor Bevin's Office blocks that person from making future comments. [*Id.*]

Plaintiff Hargis states that she uses her Facebook for "engaging in protected public speech" and that, "[in] late 2016 or early 2017, [she] posted comments on a post by Governor Bevin criticizing his right-to-work policies." [R. 1 at 10.] She states her "comment was not obscene, abusive, defamatory, or otherwise in violation of Facebook's Terms of Service." [*Id.*] On another occasion, she claims she "posted comments on a post by Governor Bevin criticizing his skilled labor apprenticeship program" that was similarly not obscene. [*Id.*] She discovered she was blocked by Governor Bevin in July 2017 and currently wishes to be unblocked. [*Id.*]

Plaintiff Morgan also uses his Twitter account to engage in political speech. [R. 3 at 3.] In February 2017, Morgan posted several comments on Bevin's Twitter account "inquiring about the status of Governor Bevin's then-overdue property taxes." [*Id.*] He states his comments "were not obscene, abusive, defamatory, or otherwise in violation of Twitter's Terms of Service." [*Id.*] On one post, Morgan wrote, "and paying our property taxes" in response to Governor Bevin's post stating, "[i]f we are to be the best version of ourselves it is going to take us doing simple things like living by the golden rule." [R. 1-2.] Governor Bevin blocked Morgan on Twitter shortly after these comments were posted. [R. 3 at 3.] Governor Bevin claims Morgan was "'spamming' his account with off-topics comments." [R. 11 at 8.]

Governor Bevin states that he wants to hear from the public on Facebook and Twitter and "[o]n-topic comments provide Governor Bevin and his staff with quick, valuable feedback pertaining to the topics at issue, and they also help to further illuminate those topics for other members of the public." [*Id.* at 5.] However, he claims that off-topic comments "detract from the

6

conversation by obscuring the chosen subject of Governor Bevin's communication and diverting the public's attention to different matters." [*Id.* at 6.] By allowing off-topic comments, he claims that he is less able to engage with commentators who do want to discuss his chosen topics of conversation, actually inhibiting dialogue between him and his constituents. [*Id.*] Governor Bevin states that he blocks both positive and negative comments that are off topic. [*Id.*]

Plaintiffs seek declaratory and prospective injunctive relief. They believe Governor Bevin's actions violate their First Amendment rights pursuant to 42 U.S.C § 1983.

## II

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (finding that issuance of a preliminary injunction "involv[es] the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.")). To issue a preliminary injunction, the Court must consider:

> (1) whether the movant has shown a strong likelihood of success on the merits;
> (2) whether the movant will suffer irreparable harm if the injunction is not issued;
> (3) whether the issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by issuing the injunction.

*Overstreet*, 305 F.3d at 573 (citations omitted).

"In the context of a First Amendment claim, the balancing of these factors is skewed toward an emphasis on the first factor." *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014). After deciding whether the movant has shown a strong likelihood of success on the merits, "the other three factors often hinge on this first factor." *Id.* For example, there can be no irreparable harm absent a substantial likelihood of a First Amendment violation. However, even

7

if the Plaintiff is unable "to show a strong or substantial probability of ultimate success on the merits" an injunction can be issued when the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

**A**

Because Plaintiffs claim Governor Bevin violated their First Amendment rights, the Court will first consider "whether the movant has shown a strong likelihood of success on the merits," *Overstreet*, 305 F.3d at 573, as "the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).

This Court is mindful that it is one of the first to wrestle with the intersections of the application of free speech to developing technology and First Amendment rights of access to public officials using privately-owned channels of communication. It is a case of first impression in the Sixth Circuit and, if appealed, would be a case of first impression to the Supreme Court of the United States as well. Only a single case on this issue has been decided and it was in the Eastern District of Virginia, which is not binding and this Court declines to follow. *See Davison v. Plowman*, 247 F. Supp. 3d 767, 771 (E.D. Va. 2017).[2] "The forces and directions of the Internet are so new, so protean, and so far reaching that courts must be conscious that what they say today might be obsolete tomorrow." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (U.S. 2017). Justice Alito is right: "we should proceed circumspectly, taking one step at a time" when applying the Constitution to social media. *Id.* at

---

[2] There is also a case pending against the President of the United States in the Southern District of New York, though no opinions on point have been published. *See Knight First Amendment Inst. at Columbia Univ., et al. v. Donald Trump, et al.*, No. 1:17-cv-05205 (S.D.N.Y.).

8

1744 (Alito, J., concurring).³ For these reasons, the Court treads lightly in assessing the likelihood of success on the merits.

When a state actor restricts speech in a public space, the Court first analyzes what type of space, or forum, exists. *Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983) ("The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue."). "[T]here are four types of fora: traditional public fora, designated public fora, limited public fora, and nonpublic fora." *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010). However, the Supreme Court has emphasized that, "[h]aving first arisen in the context of streets and parks, the public forum doctrine should not be extended in a mechanical way" to other contexts. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672–73 (1998) (holding that forum analysis was inappropriate in assessing public broadcasting program choices); *see also United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 205–06 (2003) ("The doctrines surrounding traditional public forums may not be extended to situations where such history is lacking."). Plaintiffs assert that Facebook and Twitter are traditional public fora, necessitating the highest level of scrutiny; Governor Bevin asserts Facebook and Twitter are limited fora, where speech restrictions are permissible when they are viewpoint neutral and reasonable in light of the purpose of the forum. [*See* R. 3 at 2; R. 11 at 14.] *See also Miller*, 622 F.3d at 534–35. However, neither party adequately addressed the threshold question of whether forum analysis even applies in this context. This Court finds

---

³ The Court notes that while some general themes are helpful from *Packingham*, that case dealt with a law in North Carolina preventing all sex offenders from accessing nearly every type of website, including social media. The question here is much narrower. *See Packingham*, 137 S. Ct. at 1736.

that it does not.

"[A]s an initial matter a speaker must seek access to public property or to private property dedicated to public use to evoke First Amendment concerns." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985). "[P]ublicly owned or operated property does not become a 'public forum' simply because members of the public are permitted to come and go at will." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 686 (1992) (O'Connor, J., concurring) (quoting *United States v. Grace,* 461 U.S. 171, 177 (1983)). And, "where the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 479–80 (2009). In this case, the city of Pleasant Grove was sued for denying Summum a petition to place a monument to their religion in a public park. The Summum petitioners argued that the park was a public forum and the city could not choose some monuments over others, stating it was impermissible viewpoint discrimination. *Summum*, 555 U.S. at 479. The Supreme Court rejected Summum's argument, stating that the City's decision to place a monument or reject a monument was government speech. The Supreme Court has explicitly issued caution that "a partial analogy in one context," should not "compel a full range of decisions in . . . a new and changing area," and social media is certainly a new and changing area. *Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 749 (1996).

Instead, this Court is convinced that Governor Bevin's use of privately owned Facebook Page and Twitter pages is personal speech, and, because he is speaking on his own behalf, even on his own behalf as a public official, "the First Amendment strictures that attend the various types of government-established forums do not apply." *Walker v. Tex. Div., Sons of Confederate*

*Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015). "When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000); *see also Walker*, 135 S. Ct. at 2245 ("When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says. . . . That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech.")

There is "no constitutional right as members of the public to a government audience for their policy views." *Minn. State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 286 (1984). Governor Bevin is under no obligation to listen to Plaintiffs, and Plaintiffs have no Constitutional right to be heard in this precise manner. "Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Id.* at 285. Governor Bevin has chosen to effectively, "ignore" those on Facebook he deems are not following the line of conversations he has decided to start on Facebook. *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 466 (1979) (holding, in part, "the First Amendment does not impose any affirmative obligation on the government to listen [or] to respond.")

Governor Bevin's Twitter and Facebook accounts are privately owned channels of communication and are not converted to public property by the use of a public official. Simply put, this is unlike any type of property typically protected by First Amendment forum analysis

11

law.[4] *See Cornelius*, 473 U.S. at 801–02. Governor Bevin's Twitter and Facebook accounts are a means for communicating his own speech, not for the speech of his constituents. Governor Bevin has made a series of decisions in setting up his official Facebook and Twitter accounts that indicate he intended them to be his own speech. First, his intended purpose for the accounts was to "communicate his vision, policies, and activities to constituents and receive feedback from them on the specific topics that he chooses to address in his posts." [R 11 at 3.] He never intended his Facebook or Twitter accounts to be like a public park, where anyone is welcome to enter and say whatever they want; he has a specific agenda of what he wants his pages to look like and what the discussion on those pages will be. Further, individuals cannot directly post on his account. [R. 23 at 4.] Only he posts to his own account and users are permitted to comment on whatever post he has written. [*Id.*] Governor Bevin has an automatic filter set up so that expletives and spam comments are not posted, and he does not allow comments on his page that are "obscene, abusive, clearly off topic or spam." [R. 11 at 3.] If he wanted a truly open forum where everyone could post or comment, he could have set up his accounts to allow that, but he did not. And the First Amendment does not require him to do so.

The Government argues, and this Court agrees, that the consequence of requiring Governor Bevin to allow anyone to access and post on his Facebook and Twitter accounts could shut down the pages altogether. Hypothetically, if this Court ruled Governor Bevin could not

---

[4] At least one academic argues that "[t]here's no right to free speech on Twitter. The only rule is that Twitter Inc. gets to decide who speaks and listens–which is its right under the First Amendment." A Twitter account "is a stream of communication that's wholly owned by Twitter, a private company with First Amendment rights of its own." One only has "First Amendment rights against the government, not a private party." Noah Feldman, *Constitution Can't Stop Trump from Blocking Tweets*, BLOOMBERG VIEW (June 7, 2017, 12:39 PM), https://www.bloomberg.com/view/articles/2017-06-07/constitution-can-t-stop-trump-from-blocking-tweets.

block anyone from his Twitter or Facebook accounts, his accounts could be flooded with internet spam such that the purpose of conveying his message to his constituents would be impossible and the accounts would effectively, or actually, be closed. This further supports the Court's conclusion that forum analysis is inappropriate in this context. *See Summum*, 555 U.S. at 479 ("[W]here the application of forum analysis would lead almost inexorably to closing of the forum, it is obvious that forum analysis is out of place.").

Ultimately, Governor Bevin is not suppressing speech, but is merely culling his Facebook and Twitter accounts to present a public image that he desires. As a general matter, constituents don't have a right to be heard and Governor Bevin has no obligation to listen to everyone who wishes to speak to him. *See Ark. State Highway Emp.*, 441 U.S. at 466. He has set up his Facebook and Twitter accounts to benefit him in ways he has identified, to communicate his policies and visions, and to seek specific feedback. [R 11 at 3.]

*Summum* is helpful in this analysis, as Pleasant Grove essentially practiced viewpoint discrimination in deciding who could place a monument in a park and who could not. Pleasant Grove chose monuments to go in its city park based on the image the city wanted to display; similarly, Governor Bevin wants to cull his Facebook and Twitter accounts to present an image. However, *Summum*, 555 U.S. at 479, dealt with the physical impracticalities of requiring a city to display a possibly endless number of monuments in a city park. In contrast, on Facebook and Twitter, there are no such space restrictions and, theoretically, every Facebook user could comment on each of Bevin's posts or tweets.

However, the holding in *Summum* was expanded and clarified in *Walker*, where the Supreme Court held that Texas was allowed to decide who could apply for a specialty license plate and who could not. Specifically, they held that Texas could, in accordance with the First

13

Amendment, deny the Sons of Confederate Veterans' application to design a specialty license plate. *Walker*, 135 S. Ct. at 2251. Analogizing it to *Summum*, the Court noted that, "[o]f course, Texas allows many more license plate designs than the city in *Summum* allowed monuments. But our holding in *Summum* was not dependent on the precise number of monuments found within the park. . . . Texas's desire to communicate numerous messages does not mean that the messages conveyed are not Texas's own." *Walker*, 135 S. Ct. at 2251. *Walker* made clear that the holdings in *Summum* are not contained to the exact parameters of monuments in a public park. Similarly, though there are many posts on Twitter and Facebook, they all appear on the Governor's page or are connected to his page and, thus, convey that they are coming from him. Governor Bevin is permitted to cull his desired message through his Facebook and Twitter page, much like Pleasant Grove and Texas were allowed to engage in viewpoint discrimination when they did not allow certain monuments and did not allow certain specialty license plates. Governor Bevin is not required to allow the public to speak for him.

Further, the term "block" conjures an image much harsher than reality. No one is being blocked from speaking on Twitter or Facebook. They are still free to post on their own walls and on friends' walls whatever they want about Governor Bevin. Governor Bevin only wants to prevent some messages from appearing on his own wall and, relatedly, to not view those messages he deems offensive. Blocking only prevents their direct relationship to Governor Bevin's Facebook and Twitter pages, and a "person's right to speak is not infringed when government simply ignores that person while listening to others." *Minn. State Bd.*, 465 U.S. at 288.

Ultimately, Governor Bevin is accountable to the public. The public may view his Page and account if they wish and they may choose to re-elect him or choose to elect someone else if

14

they are unhappy with how he administers his social media accounts. *See Bd. of Regents of Univ. of Wis. Sys.*, 529 U.S. at 235; *Minn. State Bd.*, 465 U.S. at 285 ("Disagreement with public policy and disapproval of officials' responsiveness . . . is to be registered principally at the polls."). Though Plaintiffs might disagree with his social media practices, the place to register that disagreement is at the polls.

Because Governor Bevin's official Facebook and Twitter accounts are Government speech and Plaintiffs do not have a Constitutional right to be heard by Governor Bevin in this specific format, the Court finds that Plaintiffs do not have a strong likelihood of success on the merits. However, their actual success on the merits remains open. "Our opinion does not guarantee the State a win on the merits." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 455 (6th Cir. 2014). Preliminary injunctions are reserved for situations where the "extraordinary remedy" of an injunction is "clearly" needed. *Overstreet*, 305 F.3d at 573. Here, in this new and developing area of law, the injunction is not clearly needed.

**B**

Though this case rests on whether there exists a substantial likelihood of success on the merits, an injunction can be issued when the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). This Court must first find the Plaintiffs will "suffer irreparable harm if the injunction is not issued." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citations omitted). "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Id.* at 578 (quoting *Basicomputer Corp. v. Scott*, 973

15

F.2d 507, 511 (6th Cir.1992)).

Since Plaintiffs have failed to demonstrate a likelihood of success on their claim that constitutional rights have been violated, they are not entitled to a presumption of irreparable harm. *See id.* This Court has found there is no actual harm in Governor Bevin's actions, much less irreparable harm not fully compensable by monetary damages, as a "person's right to speak is not infringed when government simply ignores that person while listening to others." *Minn. State Bd.*, 465 U.S. at 288. Accordingly, this Court does not find irreparable harm will occur if the injunction is not issued.

## C

Finally, the Court will determine: "whether the issuance of the injunction would cause substantial harm to others; and [] whether the public interest would be served by issuing the injunction." *Overstreet*, 305 F.3d at 573 (6th Cir. 2002). There is no legitimate claim that either party would be substantially harmed by the issuing of an injunction, but the Court also does not find that the public interest would be served by its issuance.

By issuing the injunction, though blocked individuals would have access to Governor Bevin's Facebook and Twitter pages, substantial harm to Governor Bevin would be unlikely. If his accounts became inoperable due to spam, he could open another account or simply communicate his vision and ideas to the public in another format. But, this Court is also unable to see a legitimate public interest that would be served by issuing the injunction. As there is not a strong likelihood of success on the merits, this Court cannot make the assumption that the Plaintiffs and similarly situated individuals would be served by being unblocked by Governor Bevin. Accordingly, these factors do not weigh in favor of granting the injunction.

**III**

The product of a preliminary look at the merits of this case is a modest holding—public officers can "speak" through a privately owned platform like Twitter and Facebook, and they can choose whom to listen to on those platforms without offending the First Amendment. Accordingly, Plaintiffs' Motion for Preliminary Injunction [R. 3] is **DENIED**. An Order for Meeting and Report will be entered promptly.

This the 30th day of March, 2018.

Gregory F. Van Tatenhove
United States District Judge