# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF KENTUCKY

### *ELECTRONICALLY FILED*

DREW MORGAN and MARY HARGIS,

*Plaintiffs*,

v.

MATT G. BEVIN, in his official capacity as
Governor of Kentucky,

*Defendant.*

No. 3:17-cv-00060-GFVT-EBA

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Corey M. Shapiro
Heather L. Gatnarek
ACLU OF KENTUCKY FOUNDATION, INC.
325 W. Main Street, Suite 2210
Louisville, Kentucky 40202
(502) 581-9746
corey@aclu-ky.org
heather@aclu-ky.org

Michael P. Abate
Casey L. Hinkle
Andrea Aikin
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, 4th Floor
Louisville, Kentucky 40202
(502) 416-1630
mabate@kaplanjohnsonlaw.com
chinkle@kaplanjohnsonlaw.com
aaikin@kaplanjohnsonlaw.com

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

    I.   Social Media Platforms .............................................................................................2

        A.  Facebook...........................................................................................................2

        B.  Twitter..............................................................................................................3

    II.  Governor's Official Pages and Social Media Policy.....................................................4

    III.  Plaintiffs' Tweets and Comments .............................................................................5

STANDARD OF REVIEW .....................................................................................................6

ARGUMENT ...........................................................................................................................6

    I.   The Interactive Portions of the Governor's Facebook and Twitter Pages Are First
        Amendment Fora. ....................................................................................................6

    II.  The Governor's Restriction of Speech on His Official Social Media Pages Violates the First
        Amendment on Its Face............................................................................................10

        A.  The Governor's Pages are Designated Public Fora ...........................................10

        B.  The Governor's Social Media Policy is Content-Based......................................12

        C.  The Governor's Social Media Policy Cannot Survive Strict Scrutiny................12

        D.  Even If the Interactive Spaces of the Governor's Pages are Limited Public Fora, His
            Restriction of Speech Facially Violates the First Amendment. ...........................16

            1.  The Restrictions on Off-Topic and Profane Speech Are Unreasonable.............17

            2.  The Social Media Policy is Not Viewpoint Neutral.................................20

            3.  The Governor's Policy Gives Employees Unfettered Discretion to Ban Speech.
               ....................................................................................................23

    III.  Even if the Governor's Social Media Blocking Policy is Facially Constitutional, the Blocking
         of Plaintiffs Violated their First Amendment Rights................................................24

CONCLUSION.......................................................................................................................25

CERTIFICATE OF SERVICE ..............................................................................................26

## INTRODUCTION

Since this Court entered its preliminary injunction ruling, every court to consider the question has held that the interactive spaces of a public official's social media account—where citizens can interact with their elected leaders—is a "forum" for First Amendment purposes. *See, e.g., Robinson v. Hunt County, Texas*, __ F.3d __, 2019 WL 1594319 (5th Cir. Apr. 15, 2019); *Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019), as amended (Jan. 9, 2019); *Campbell v. Reisch*, __ F. Supp. 3d __, 2019 WL 573433 (W.D. Mo. Feb. 8, 2019); *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940 (W.D. Wis. 2019); *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018); *Price v. City of New York*, 2018 WL 3117507 (S.D.N.Y. June 25, 2018); *Leuthy v. LePage*, 2018 WL 4134628 (D. Me. Aug. 29, 2018). The Governor may not exclude someone from participating in such a forum unless his actions conform to long-established rules set by the Supreme Court.

Caselaw is clear that when a public official creates a social media account on platforms like Twitter or Facebook, which permit users to interact directly with those officials concerning any topic of *the users'* choosing, the official has created a designated public forum. In that kind of space, the Governor cannot limit or punish speech based either on its content or its viewpoint unless the restriction can survive strict scrutiny. And, even if the interactive spaces of these accounts were merely deemed to be a "limited" public forum, the Governor still could not ban users from interacting with him unless his policy was both viewpoint neutral and reasonable in light of the forum in question.

The Governor's social media policy fails each of these tests. The Governor has banned almost three thousand individuals from interacting with him in the modern public square—permanently and indefinitely—because of the content and/or viewpoint of their social media posts. The policy cannot survive strict scrutiny because it serves no compelling interest; is not narrowly tailored; and is nowhere near the least restrictive means to achieve the Governor's stated goal.

Indeed, the Governor's policy is so vague and inconsistently applied that it can only be seen as viewpoint-based and unreasonable. It violates the First Amendment must be permanently enjoined.

<strong>STATEMENT OF FACTS</strong>

**I.     Social Media Platforms**

**A.     Facebook**

Facebook is the world's largest social media platform, with over two billion active users. [DN #23, 15:12-16.] Its mission is to "Give people the power to build community and bring the world closer."[1] Facebook advances its mission by "[c]onnect[ing] you with people and organizations you care about," and "[e]mpower[ing] you to express yourself and communicate about what matters to you."[2]

Facebook users create user profiles, which are unique to and controlled by each individual user. Facebook also offers pages for "[b]usinesses, organizations and public figures" to "connect with their customers or fans on Facebook."[3] A "verified page" is one that Facebook has confirmed is the authentic page or profile for a public figure. Ex. 1, Maglinger Dep. 20:3-12.[4] A page that has been verified is identified with a blue checkmark next to the page name. *Id.*

Facebook users may interact with each other, and with pages, in a number of ways. Users may "react" to a post, either on another user's account or on a page, using a set of available responses, indicating that they "like it, agree with it, love it, hate it," etc. [DN #23, 20:12-25.] Facebook users may also comment on others' posts. *Id.* at 21:1-15. These comments appear directly next to the name and profile picture of the responding user. Ex. 1, 115:14-25. And, users may share posts from pages or from other users' accounts, which means that the content is then published to

---

[1] https://www.facebook.com/pg/facebook/about/ (last accessed April 30, 2019).
[2] https://www.facebook.com/legal/terms (last accessed April 30, 2019).
[3] https://www.facebook.com/help/282489752085908?helpref=popular_topics (last accessed April 30, 2019).
[4] For the Court's convenience, an index of all exhibits referenced is attached as Exhibit 35.

the user's own page. [DN #23, 20:6-7.] A user who has been blocked from a Facebook page may

view the content on that page, but may not react to or comment on posts on that page. *Id.* at 31-32.

### B. Twitter

According to its website, Twitter is "what's happening in the world and what people are

talking about right now."[5] Twitter has over 300 million monthly active users.[6]

Twitter users create accounts and usernames; there is no requirement that a username be the

user's actual name.[7] Similar to Facebook, a Twitter user's account may be "verified," which means

that an account of public interest is authentic. Ex. 1, 18:9-20. Accounts of public interest include

"users in music, acting, fashion, government, politics, religion, journalism, media, sports, business,

and other key interest areas."[8] Unlike the distinction between a page and a user account on

Facebook, all accounts on Twitter use the same format. Although Twitter accounts are public by

default, a user may choose to "protect" an account, which means that the user would "receive a

request when new people want to follow [them], which [they] can approve or deny."[9]

Users interact with each other on Twitter through replies (commenting on another person's

tweet [DN #23, 41:22-23], which appear beside the username and profile picture of the user making

the reply); mentions or "Tweeting at" another user ("engaging other users by using the at symbol,

and then in front of their name," *Id.* at 45:11-20); retweets (when a user shares another user's Tweet

on their own account, *Id.* at 41:22-25); and reacting through a Tweet with a built-in "like" button.[10]

Tweets and replies are limited to 240 characters each.

---

[5] https://about.twitter.com/ (last accessed April 30, 2019).

[6] https://s22.q4cdn.com/826641620/files/doc_financials/2018/q4/Q4-2018-Shareholder-Letter.pdf at 11 (last accessed April 30, 2019).

[7] https://help.twitter.com/en/managing-your-account/change-twitter-handle (last accessed April 30, 2019).

[8] https://help.twitter.com/en/managing-your-account/about-twitter-verified-accounts (last accessed April 30, 2019).

[9] https://help.twitter.com/en/safety-and-security/public-and-protected-tweets (last accessed April 30, 2019).

[10] https://help.twitter.com/en/using-twitter/liking-tweets-and-moments (last accessed April 30, 2019).

A user who has been blocked from another user's Twitter account may not view the content of that account, or interact with that content (including replying, liking, or retweeting). [DN #23, 49:16-20.] A user who logs out of their account and visits the Twitter page from which they have been blocked may then view the content on that page, but may not interact with it in anyway. *Id.*

## II.   Governor's Official Pages and Social Media Policy

Since his election as Governor, Matt Bevin has maintained official Facebook and Twitter accounts, both of which are "verified" with a blue checkmark on their respective platforms. Ex. 1, 18:9-20, 20:3-12. At least eighteen employees of the Governor's Office have helped monitor these pages, as part of their state employment and using state resources. Ex. 2, Def. Supp. Resp. at 4. Governor Bevin's official Facebook account, with the unique user handle of "@GovMattBevin," is identified as "The official Facebook page of Kentucky Governor Matt Bevin," and links to the official webpage at http://governor.ky.gov. Ex. 3, Facebook Screenshot. Over 130,000 people follow Governor Bevin's official Facebook page.[11] His official Twitter account, with username @GovMattBevin, also links to the same official webpage. Ex. 4, Twitter Screenshot. Governor Bevin's personal Twitter account, @MattBevin, directs users to "Please follow @GovMattBevin to get official updates from the Office of the Governor."[12] Over 92,000 people follow Governor Bevin's official Twitter page.[13]

In July 2017, the Governor publicly disclosed his social media policy for the first time. In it, the Governor claims the right to ban users who post "obscene and abusive language or images, or repeated off-topic comments and spam." Ex. 5, Def. Resp. Interrog. No. 5. Those vague terms are not defined anywhere in the policy or statute, and—as discovery in this case has shown—are implemented in widely varying ways by the employees who monitor the Governor's social media

---

[11] https://www.facebook.com/GovMattBevin (last accessed April 30, 2019).
[12] https://www.twitter.com/MattBevin (last accessed April 30, 2019).
[13] https://www.twitter.com/GovMattBevin (last accessed April 30, 2019).

feeds. In many instances described below, individuals have been banned solely for posting content critical of the Governor or his policies.

## III.    Plaintiffs' Tweets and Comments

Plaintiff Drew Morgan is a Kentucky citizen who resides in Jefferson County. He is a patient care assistant and unit coordinator at a children's hospital. Ex. 6, D. Morgan Dep. 6:24-25. He is an active Twitter user, with the username @GoBigBlueDrew.

In early February 2017, local media sources reported that Governor Bevin owed taxes on his personal home, and that the taxes were overdue.[14] On February 8, in response to these news stories, Mr. Morgan posted replies to several of the Governor's posts, and referenced the Governor's overdue property taxes. For instance, in reply to Governor Bevin's tweet reading, "If we are to be the best version of ourselves it is going to take us doing simple things like living by the golden rule. #SOTC17 #WeAreKY," Mr. Morgan replied, "and paying our property taxes." Ex. 7, July 11, 2017 ACLU Letter at 6. In reply to Governor Bevin's tweet reading, "Take pride in your state. Take pride in your community #SOTC17 #WeAreKY," Mr. Morgan replied, "take pride in paying the taxes on your house." *Id.*

At some point on February 8, or early on February 9, Governor Bevin blocked Mr. Morgan from his official Twitter page. Ex. 6, 78:18-19. Mr. Morgan remains blocked from the Governor's Twitter page. He is unable to view the Governor's posts without logging out of his account, and he is unable to like, reply to, or retweet any of the Governor's Tweets.

Plaintiff Mary Hargis is a Kentucky citizen who resides in Rowan County. She is a retired state employee Ex. 8, Hargis Dep. 7:6. She maintains a personal Facebook account under her name.

Ms. Hargis never followed Governor Bevin on Facebook; however she occasionally visits his verified official page and has, in the past, commented on some of his posts. Ms. Hargis recalls

---

[14]   *See, e.g.,*   https://www.courier-journal.com/story/news/politics/2017/02/08/kentucky-governor-matt-bevin-wife-owe-11k-2016-property-taxes/97652528/ (last accessed April 30, 2019).

making a comment on one of Governor Bevin's posts in approximately late 2016, at which time the Governor had announced a new workforce development and skilled labor apprenticeship program; Ms. Hargis expressed her disagreement with the Governor's right-to work policies. [DN #1, ⁋46.] Some months later, Ms. Hargis again viewed a post on the Governor's page, and at that time realized that she could no longer comment on his post, which means she had been blocked. Ex. 8, 84:22-85:1. Because she was blocked from the Governor's page, no record exists of the precise comment she made. Ex. 5, Resp. RFP No. 14. Ms. Hargis remains blocked from the Governor's official Facebook page and is unable to comment, react to, or interact with any of the his posts.

## STANDARD OF REVIEW

Summary judgment must be granted if the movant shows, as to one or more claims, that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[15] The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

"A plaintiff seeking a permanent injunction must demonstrate that it has suffered irreparable injury, there is no adequate remedy at law, that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted, and that it is in the public's interest to issue the injunction." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006).

## ARGUMENT

**I.    The Interactive Portions of the Governor's Facebook and Twitter Pages Are First Amendment Fora.**

---

[15] Unless otherwise stated, all internal citations and quotation marks are omitted.

At the time of its preliminary ruling in this case, this Court noted that "[o]nly a single case on this issue has been decided." *Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1009 (E.D. Ky. 2018) (citing *Davison v. Plowman*, 247 F.Supp.3d 767, 771 (E.D. Va. 2017)). This Court elected not to follow *Plowman*'s application of forum analysis to social media accounts, holding that the Governor may "cull[ ] his Facebook and Twitter accounts to present a public image that he desires." *Id.* at 1012.

Numerous courts have since considered the issue of whether the interactive portions of a government official's social media accounts—that is, the portions of the social media page where other users may comment or reply to a post—are subject to First Amendment scrutiny. Uniformly, those courts have held that while a public official's own statements on Twitter and Facebook are government speech, the interactive space that allows members of the public to interact with their elected officials is akin to a modern-day "public square" or "town hall" entitled to the protections offered by the First Amendment. *See, e.g.*, *Davison v. Randall*, 912 F.3d 666, 687 (4th Cir. 2019), as amended (Jan. 9, 2019) ("[C]oncluding that interactive component of the [Defendant]'s Facebook Page amounts to a public forum."); *Robinson v. Hunt County, Texas*, __ F.3d __, 2019 WL 1594319, at *3 (5th Cir. Apr. 15, 2019) (citing *Davison* and applying forum analysis to official Facebook page); *Campbell v. Reisch*, __ F. Supp. 3d __, 2019 WL 573433, at *4 (W.D. Mo. Feb. 8, 2019) ("[T]he interactive space following each tweet in which other users may directly interact with the content of the tweets is subject to forum analysis."); *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 953 (W.D. Wis. 2019) (applying forum analysis to interactive portions of public official's Twitter account); *Knight*, 302 F. Supp. 3d 541 (S.D.N.Y. 2018) (holding interactive space of President's Twitter account is a designated public forum); *Price v. City of New York*, 2018 WL 3117507, at *14–15 (S.D.N.Y. June 25, 2018) (holding interactive aspects of Twitter are not government speech).

These holdings properly apply First Amendment analysis to government officials' social media pages. As the Supreme Court stated, in today's world social media functions as "the modern

public square" where "users can petition their elected representatives and otherwise engage with them in a direct manner." *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735, 1737 (2017). "Indeed, Governors in all 50 States and almost every Member of Congress have set up accounts for this purpose." *Id.* at 1735. Thus, when elected officials ban individuals from interacting on their official social media pages, they directly infringe upon those users' right to speak and participate in the modern-day political world.

As these courts have recognized, the interactive features of social media platforms like Twitter and Facebook easily fit within established doctrines of First Amendment forum analysis. First, there is no question that steps taken by state employees to restrict the interaction of citizens and the Governor were done under color of state law and therefore implicate the constitutional protections of the First Amendment (enforceable under 42 U.S.C. § 1983). *See Davison*, 912 F.3d at 680; *Knight*, 302 F. Supp. 3d at 568; *Price*, 2018 WL 3117507, at *10.

Moreover, one of the main purposes of the Governor's social media accounts is "to further [his] duties as a[n elected] official." *Davison*, 912 F.3d at 680. As in *Davison*, Governor Bevin uses the pages "as a tool of governance" to "provide[] information to the public about [his] and the [state's] official activities and solicit[] input from the public on policy issues [he] confront[s]." *Id.*; *see also One Wisconsin Now*, 354 F. Supp. 3d at 952 (representatives' social media accounts "are intertwined with their public responsibilities," . . .were used "to share information on legislative matters, policies, political appearances, and events," and were maintained "us[ing] government resources").

The record in this case amply demonstrates the ways that Governor Bevin's official social media accounts are a "tool[s] of governance." *Davison*, 912 F.3d at 680. The Governor's Facebook and Twitter pages are "official" pages, not his own "private" pages. Ex. 9, Fed. R. Civ. P. 30(b)(6) Dep. 10:12-11:10. Both are "verified" as belonging to a government official and link to the governor.ky.gov website. Exs. 3, 4. And both accounts are maintained using government resources,

8

including employee time, computers, and phones. *See, e.g.,* Ex. 10, List of Employees Who Monitor Governor's Pages; *see also* Ex. 1, 70:1-19 (noting he uses state-issued devices to monitor Governor's social media accounts). And—perhaps most importantly—blocking is done by government employees in their official capacity, including Governor Bevin. *See, e.g.,* Ex. 9, 102:1-110:23; Ex. 1, 74:7-97:21; Group Ex. 11, Texts from Governor Bevin.

Second, the interactive portions of Twitter and Facebook are "'compatib[le] with expressive activity.'" *Davison*, 912 F.3d at 682 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985)). In fact, "[t]he interactivity of [social media] is one of its defining characteristics, and indeed, the interactive space of the President's tweets accommodates a substantial body of expressive activity." *Knight*, 302 F. Supp. 3d at 575.

It makes no difference for purposes of forum analysis that Facebook and Twitter are private companies. The First Amendment's forum analysis principles apply even where property is privately owned, so long as the government is exercising effective control. *Cornelius*, 473 U.S. at 801 (forum analysis applies even to "private property dedicated to public use"). *See also Davison*, 912 F.3d at 682-685; *Campbell*, __ F. Supp. 3d __, 2019 WL 573433, at *3; *Knight*, 302 F. Supp. 3d at 566.

Finally, the Supreme Court's decision in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), "supports, rather than undermines, [the] conclusion that the interactive component of the [defendant's] Facebook Page constitutes a public forum." *Davison*, 912 F.3d at 686. Unlike *Pleasant Grove*, there is no risk that comments posted on an official's social media page, or in response to the officials' posts, will be mistaken for government speech. *See, e.g., Leuthy*, 2018 WL 4134628, at *11 ("The posts on the Facebook page are labeled with the name of the person who posted them, and the Governor's speech—his posts—is distinct from the private citizen posts."); *see also* Ex. 1, 115:14-25, 118:4-13. Nor are there any space limitations such that the application of forum analysis would inevitably lead to closure of the relevant forum. *See Knight*, 302 F. Supp. 3d at 573 ("[T]he interactive

space of a tweet can accommodate an unlimited number of replies and retweets."); *Campbell*, __ F. Supp. 3d __, 2019 WL 573433, at *5 ("[T]he 'limited space' exception in *Pleasant Grove* does not apply" to interactive features of public officials' social media accounts). *See also* Ex. 1, 119:16-24.

## II.    The Governor's Restriction of Speech on His Official Social Media Pages Violates the First Amendment on Its Face.

### A.    The Governor's Pages are Designated Public Fora

The government's ability to restrict the speech of others on property it controls (whether real or virtual) depends on the type of "forum" at issue. Federal courts have recognized four types of fora: the traditional public forum, designated public forum, limited public forum, and nonpublic forum. *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010). In *any* type of forum, restrictions on speech must be viewpoint neutral. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

The first two types of fora—traditional and designated public fora—are open "for use by the public at large for assembly and speech." *Miller* at 534. In both, reasonable time, place, and manner restrictions on speech are permissible, but "but content-based restrictions must satisfy strict scrutiny, *i.e.*, they must be narrowly tailored to serve a compelling government interest." *Pleasant Grove*, 555 U.S. at 460; *Miller* at 534.

A designated public forum is one in which the government intentionally opens a piece of property to public speech. *Miller* at 534. To determine if such a forum has been opened, courts first look to see if the government has made the forum "generally available to an entire class of speakers or whether individual members of that class must obtain permission in order to access" the forum. *Putnam Pit, Inc. v. City of Cookeville, Tenn.*, 221 F.3d 834, 844 (6th Cir. 2000). Courts then also look to "whether the exclusion of certain expressive conduct is properly designed to limit the speech activity occurring in the forum to that which is compatible with the forum's purpose." *Id.* at 843-44.

On these facts, the interactive portions of the Governor's official Facebook and Twitter pages are designated public fora. *See One Wisconsin Now*, 354 F. Supp. 3d at 955. The pages are open to the "public at large." *Miller* at 534. Individuals do not need to "obtain permission in order to access the property." *Putnam Pit,* 221 F.3d at 844. So long as an individual has their own Facebook or Twitter account, they may access the Governor's pages and comment thereon. The interactive portions of these pages are publicly available, and are not limited to Kentuckians, or to registered voters, or to any other demographic. Ex. 1, 99:10-101:9, 111:15-112:18. Simply put, the Governor's choice to establish his accounts on platforms that are open to the public for speech on any topic demonstrates an intent to create a designated public forum. *See One Wisconsin Now*, 354 F. Supp. 3d at 954 ("If defendants truly had no intention to create a space for public interaction and discourse, they would not have created public Twitter accounts in the first place . . . Having opted to create a Twitter account, however, and benefit from its broad, public reach, defendants cannot now divorce themselves from its First Amendment implications and responsibilities as state actors.").

The Governor's intent to create a designated public forum also may be discerned from the manner in which he uses these pages. *See United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 350 (6th Cir. 1998). The Governor uses social media to communicate with his constituents "without having to send those messages through the filter of the media." [DN #11 at 3.] He regularly encourages people to join him on social media to watch videos he may post; participate in discussion during live video streams; and to provide feedback on topics ranging from the state workers' pension system, to whether he should shave or grow his beard. Group Ex. 12, Screenshots of Video Posts; Ex. 1, 112:6-18. He also uses the interactive space to review comments to get a "flavor" for what his constituents think are hot topics. *Id.* at 110:24-111:14. And, he occasionally even responds to the users who post comments or replies on his posts.

11

Group Ex. 13, Screenshots of Governor's Replies. Plainly, the Governor understands that these pages are not static, one-way means of communication.

### B.     The Governor's Social Media Policy is Content-Based

The Governor's social media policy is content-based. As the Supreme Court recently reaffirmed, any restriction that "target[s] speech based on its communicative content" is content-based. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). The Governor's policy targets content in (at least) two distinct ways: a user may be blocked if they post "repeated off-topic" comments or "obscene" language. Ex. 5 at 5-6. Topical limitations plainly require consideration of the "communicative content" of the message. *See One Wisconsin Now*, 354 F. Supp. 3d at 955 (blocking Facebook user for prior comment is content-based restriction). Similarly, restrictions on the supposedly obscene or offensive nature of a post are clearly content-based. *See Planet Aid v. City of St. Johns*, 782 F.3d 318, 326 (6th Cir. 2015) ("A ban on profanity, for instance, is . . . content-based").

### C.     The Governor's Social Media Policy Cannot Survive Strict Scrutiny

As noted, in a designated public forum, content-based restrictions will be subject to strict scrutiny. *Pleasant Grove*, 555 U.S. at 460. Under that standard, content-based restrictions must serve a compelling governmental interest, be narrowly drawn to achieve that interest, and be the least restrictive means necessary to achieve that interest. *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 45 (1983). The Governor's policy fails each step of this analysis.

First, the social media policy is not narrowly tailored to achieve a compelling state interest. The Governor's Office claims that policy is necessary to avoid the Governor's messages being "drown[ed] out," and to ensure the public's ability to receive information from the Governor. [DN #11 at 2.] This asserted interest is hardly "compelling." *See, e.g., One Wisconsin Now*, 354 F. Supp. 3d at 948-49, 956 (rejecting legislator's argument that there was a compelling governmental interest in

"stop[ping] the posting of tweets unrelated to the topic of the original tweets he posted"). But even if it were, the policy is not narrowly tailored to achieve it.

There is no risk that the Governor's message will be "drowned out" on his social media pages, no matter the number or nature of replies or comments. *See Knight*, 302 F. Supp. 3d at 573 ("[T]he interactive space of a tweet can accommodate an unlimited number of replies and retweets."). Any visitor to the Governor's pages sees, first and foremost, the posts that the Governor chooses to make and the message the Governor intends to relay. *See, e.g.*, Ex. 4; Ex. 14, Facebook  Screenshot. The Governor's posts remain prominently displayed, regardless of the number of comments or replies. *Id.* In fact, on both Facebook and Twitter, a visitor to the Governor's page must take affirmative action to view the comments or replies on each of his posts by clicking to expand and view the comments or replies. Ex. 1, 47:9-15, 65:24-66:7. And, the Governor's ability to make his own posts on either Facebook or Twitter is not impacted at all by the number of comments other users may make on his posts. *Id.* at 116:12-19, 119:16-24.

Moreover, the policy is applied in an overbroad way that punishes far more speech than the constitution allows. The record in the case makes clear that the Governor's staff considers mere profanity to be "obscene" speech that can be banned. *See* Ex. 9, 71:1; Ex. 15, Stamper Dep. 66:21-67:1; Ex. 16, Kuhn Dep. 44:12-15. In fact, the record is replete with examples of commenters who were banned for making otherwise relevant and responsive comments that happened to use a passing expletive. One common example of this relates to the Governor's October 2, 2017 tweet in the aftermath of the tragic Las Vegas shootings that killed 59 concertgoers. The Governor tweeted: "To all those political opportunists who are seizing on the tragedy in Las Vegas to call for more gun regs …You can't regulate evil…" Ex. 17, October 2, 2017 Gov. Bevin Tweet. Numerous users were banned for making otherwise on-topic comments that happened to use passing profanity (or near-profanity). Group Ex. 18, Twitter Replies. Examples of such comments include: "Front-runner for

13

clown of the day @GovMattBevin. Of course you can't regulate evil, but you sure as hell can limit the damage one can do." (@TheDon101300); "It's asinine we allow assault weapons or the ability to modify a weapon to discharge dozens of bullets in seconds in America. F*** lobbyists." (asterisks in original) (@spartangolfer33); "people died just quit with YOUR political bullshit" (@susan_noble). *Id.* at GOV001011, GOV001017, GOV001037. Permanently blocking users for passing profanity, regardless of the topics addressed, is patently unconstitutional. *See Cohen v. California*, 403 U.S. 15, 18 (1971) ("[T]he State certainly lacks power to punish Cohen for the underlying content of the message" for wearing a jacket reading "F*** the Draft"); *Leonard v. Robinson*, 477 F.3d 347, 360 (6th Cir. 2007) ("Prohibiting Leonard from coupling an expletive to his political speech is clearly unconstitutional.").

To be sure, *actual* obscenity—that is, "works which depict or describe sexual conduct" that "appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value," *Miller v. California*, 413 U.S. 15, 24 (1973)—is not subject to constitutional protection. But mere profanity is not obscenity, and the Governor cannot constitutionally ban people from interacting with him in the modern public square because of a curse word. *Leonard*, 477 F.3d at 360; *see also U.S. v. Landham*, 251 F.3d 1072, 1086 (6th Cir. 2001) (finding vulgar comments such as "unmotherly piece of crap" and "herpes slut"—among others—not obscene).[16]

This overzealous censorship is unsurprising, given that the Governor's employees are not well-trained in the law or how to consistently apply the policy. *See, e.g.*, Ex. 9, 35:12-18 (no knowledge of whether staff trained for social media monitoring); Ex. 15, 22:9-23:17 (explaining minimal, verbal instructions provided to new hires and confirming absence of any written training

---

[16] Plaintiffs do not seek the right to post other kinds of non-constitutionally-protected speech, including: defamation, *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964); fighting words, *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); incitement, *Brandenburg v. Ohio*, 395 U.S. 444 (1969); and information deleterious to national security, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)).

materials or training on specific examples of on- and off-topic use). The result is that whether or not a Facebook or Twitter user is blocked from the Governor's official pages may depend entirely on which employee is monitoring the page that day—a result that cannot withstand constitutional muster. *See, e.g.,* *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871 (1997). It also appears that individuals are blocked for speech that does not, on its face, seem to violate the Governor's stated policy. Group Ex. 19, Screenshots of Blocked Users.[17] This inconsistent and ad hoc application of the policy has led to thousands of people being blocked from the Governor's official social media pages, all of whom are now unable to engage in constitutionally-protected speech in those fora. And it appears that number just continues to grow. *Compare* Phillip Bailey and Morgan Watkins, *Gov. Matt Bevin blocks hundreds on Twitter and Facebook*, COURIER-JOURNAL (June 15, 2017) (reporting roughly 600 accounts blocked, based on open records obtained) *with* Exs. 20, 21, and 22 (list of blocked users, showing over 2800 users blocked).

The Governor's social media policy also is not the least restrictive means necessary to achieve its stated interest, as required by the constitution. *See Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666 (2004). This Court previously summarized numerous other less-restrictive means available to the Governor for monitoring social media, including "muting" users on Twitter, hiding comments (but not subsequently blocking the user) on Facebook, and reporting specific comments or entire user account to the respective platform. [DN #26 at 3-5.][18]

---

[17] Many of the pages of screenshots provided in discovery by the Governor's Office include screenshots of more than one blocked user cut and pasted on a single page. To avoid confusion, when this occurred on screenshots relevant to this brief, Plaintiffs redacted the irrelevant screenshot. Additionally, this exhibit, and others identified as "Group Exhibits," provide an illustrative sampling of relevant documents, but are not intended to be an exhaustive collection of all information supporting Plaintiffs' arguments.

[18] It is important to note, however, that the social media networks' terms of service do not trump the First Amendment. Thus, the Governor must permit all the speech allowed by the Constitution, even if Facebook or Twitter might otherwise limit it. *See, e.g.,* *Robinson*, __ F.3d __, 2019 WL 1594319, at *6 (rejecting defendant's reliance on Facebook's commenting policies because "[a] private policy cannot authorize a state actor to engage in conduct that violates the Constitution").

Finally, the Governor's policy is not the least restrictive means to achieve his stated goals because it has permanent consequences disproportionate to the alleged harm caused by the supposedly offending speech. Individuals who are blocked from the Governor's pages are blocked indefinitely—unless or until they figure out how to request being unblocked (a procedure that is not published anywhere on the Governor's pages, Ex. 23, Burton Dep. 124:21-125:18) and agree to abide by the unconstitutional policy, which they must do even if they feel they did not violate the policy in the first place. *See, e.g.*, Ex. 9, 62:19-25; Ex. 1, 130:18-131:7; Ex. 24, Crawford Email. Blocked Twitter users "cannot see or reply to the blocking user's tweets, view the blocking user's list of followers or followed accounts, or use the Twitter platform to search for the blocking user's tweets." *Knight*, 302 F. Supp. 3d at 551. Similarly, a blocked Facebook user cannot comment on or react to posts made by the blocking user; cannot tag the blocking user in any comments or posts; and cannot start a conversation online with the user. They are thus unable to "petition their elected representatives and otherwise engage with them in a direct manner." *Packingham*, 137 S. Ct. at 1735.

Indeed, the default permanency of the blocking is not merely a defect in tailoring the policy, but also is an impermissible prior restraint on *future* speech, which is among the "most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Such prior restraints are *presumptively* unconstitutional. *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).

### D.   Even If the Interactive Spaces of the Governor's Pages are Limited Public Fora, His Restriction of Speech Facially Violates the First Amendment.

Defendants may argue that the interactive spaces of the Governor's official social media pages are limited public (or nonpublic) fora.[19] While that argument is incorrect for myriad reasons just explained, it would not save the Governor's policy from invalidation. Even in a limited public

---

[19] The test for determining whether the speech restrictions satisfy the First Amendment is the same for nonpublic and limited public forums. *Miller*, 622 F.3d at 535-36.

forum, any speech restrictions must be reasonable and viewpoint neutral. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001). The Governor's policy is neither.

As noted, the Governor claims the right to ban users who post "obscene and abusive language or images, or repeated off-topic comments and spam." Ex. 5 at 5-6; Ex. 25, Media Inquiry Email. These vague limitations are unreasonable and discriminate based on the speakers' viewpoints. Moreover, the Governor has given unfettered discretion to his employees to interpret and apply those vague terms, which itself is an independent violation of the First Amendment, even in a limited public forum.

### 1.     The Restrictions on Off-Topic and Profane Speech Are Unreasonable

First, the Governor's speech restrictions are not reasonable when judged against the purpose of the forum and all the surrounding circumstances. *See United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.,* 163 F.3d 341, 356 (6th Cir. 1998). The undisputed facts show that Facebook and Twitter allow individuals a space to comment, engage, share, and receive information on an unlimited range of subjects. And indeed the Governor has sought such interaction; he posts solicitations for feedback on his social media accounts and his staff review the comments to get a "flavor" for the comments received. Ex. 15, 94:6-18; Ex. 1, 110:24-111:14. The Governor also uses the interactive space to engage directly with others by replying to individual comments. Group Ex. 13.

It is therefore unreasonable for the Governor to try to limit his social media pages only to comments he and his staff deem "on-topic." That is simply not "reasonable in light of the purpose served by the forum," *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1886 (2018). Again, "[h]aving opted to create a Twitter account…and benefit from its broad, public reach, [the Governor] cannot now divorce [himself] from its First Amendment implications and responsibilities as [a] state actor[]."*One Wisconsin Now*, 354 F. Supp. 3d at 954.

17

Moreover, even if the Governor's "off-topic" limitation were consistent with the nature of social media, he "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 138 S. Ct. at 1888. As noted, the Governor provides no policy guidelines as to how to determine what "off-topic" means. Visitors to Governor Bevin's page must do their best to ascertain the specific topic of each of his posts, in order to properly tailor their comments to his assigned topic. This task is made more difficult by the fact that Governor Bevin frequently posts what his staff refer to as "evergreen" posts, such as a picture of a Kentucky sunset. *See, e.g.*, Ex. 23, 99:3-7; Ex. 15, 82:16-18; Ex. 26, Sunset Tweet. These evergreen posts have no clearly delineated topic but rather are "very general" posts, Ex. 15, 82:16-18, leaving a visitor to do his or her best to confine their posts to avoid being blocked. The Governor also provides no policy on what "repeated" means for purposes of when one will be blocked. *See, e.g.*, Ex. 16, 47:12-24 (repeated three times in one posts; not across posts); Ex. 9, 76:9-77:7 (repeated at least twice, within a post or across the "whole universe of that person's comments"); Ex. 23, 101:22-24 (repeated three times in a post will get you blocked; repeated across posts require more than three); Ex. 1, 129:8-130:4 (no "magic number" for repeated). Further, the Governor's policy on banning people who make "repeated" comments is unreasonable given the inability of the Governor's office to meaningfully track that information. Ex. 15, 74:19-23 ("impossible to monitor" repeated comments over time); *see also Mansky*, 138 S. Ct. at 1889-90 (it would be unreasonable to require the official to maintain "a mental index of the platforms and positions of every candidate and party on the ballot").

A series of tweets and posts that concern the death of former Kentucky State Representative Dan Johnson, who died by suicide after becoming the subject of a Peabody-award winning investigation by the Kentucky Center for Investigative Reporting, provides just one example of how the "off-topic" limitation leads to unreasonable blocking. In December 2017, the Governor tweeted: "Saddened to hear of tonight's death of KY Representative Dan Johnson...My heart breaks for his

family tonight...These are heavy days in Frankfort and in America...May God indeed shed His grace on us all...We sure need it..." Ex. 27, December 13, 2017 Tweet. Numerous users were blocked by the Governor and his staff for making comments directly responsive to this tweet that did not include any profanity. Group Ex. 28, Screenshots of Blocked Users. For example, one commenter was banned for saying "Um, how about some grace for the molested girl", *id.* at GOV001659, and another was banned for saying "However not a single reference to the woman molested by Johnson……", *id.* at GOV001591, and yet another for saying "may god shed his light on the victim and forgive this child molestor. How about let's not elect / hire more molestors?". *Id.* at GOV001655.

The Governor's restriction on "obscenity" also is unreasonable. As previously noted, although the Governor claims the right to block "obscene" comments, he and his staff in reality use the policy to ban a far broader range of speech: mere profanity. *See, e.g.,* Ex. 9, 71:1. Indeed, the Governor's former Communications Director even suggested that posts using other letters or characters to merely suggest a profane meaning would be sufficient to be blocked under the "obscenity" restriction, Ex. 15, 66:23-67:1—as indeed was the case in one of the Las Vegas shooting comments cited above. Group Ex. 18 at GOV001017.

Blanket prohibitions against "offensive" or "profane" speech are presumptively invalid, regardless of forum. *See, e.g., Matal v. Tam,* 137 S. Ct. 1744, 1763 (2017) ("…the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *Leonard,* 477 F.3d at 360. But that is precisely what the Governor does here. For example, the Governor blocked a Kentucky-based healthcare advocate who mentioned the Governor in a political statement regarding Medicaid expansion because she began the comment with a mild expletive. Ex. 29, July 24, 2018 Maglinger Text. She tweeted: "Holy Shit. The @GovMattBevin just admitted they know the majority of people with #kymedicaid are working, and still doubled down

on the very expensive rube Goldberg solution to the nonexistent problem on @KyTonightKET." *Id.*

The Governor's decision to block Ms. Stewart illustrates yet another example of the unreasonableness of the policy. Ms. Stewart's comment was not made in direct response to a post by the Governor. Rather, she was posting on her own page but merely mentioned Governor Bevin. Indeed, under the Governor's policy, numerous individuals were blocked for speech made on their own pages outside the confines of the Governor's pages. Group Ex. 30, Screenshots of Users Blocked.

For these constitutionally protected and substantive responses to the Governor's own comments, these individuals were indefinitely banned from interacting with the Governor on Twitter. That highlights yet another unreasonable aspect of the social media policy at issue here: it permanently banishes citizens from important portions of the "modern public square" for a single transgression. *Packingham*, 137 S. Ct. at 1737. Yet courts have repeatedly held that exclusions for far *shorter* periods of time and for far *more* egregious conduct are invalid because they are insufficiently tailored to further the governmental interests at stake. *See Cyr v. Addison Rutland Supervisory Union*, 60 F.Supp.3d 536, 548 (D. Vt. 2014) (in a limited public forum "categorical ban of a single individual…is not narrowly tailored"); *Brown v. City of Jacksonville*, No. 3:06-cv-122, 2006 U.S. Dist. LEXIS 8162, at *12 (M.D. Fla. 2006) (three-month ban from attending City Council meetings "not . . . 'narrowly tailored' to achieve the significant governmental interest of running the meetings efficiently, while successfully preventing her disruptive behavior."); *Huminski v. Corsones*, 396 F.3d 53, 92 (2d Cir. 2005) ("categorical ban on expressive speech singling out an individual does not even satisfy the lower threshold of reasonableness review" for a nonpublic forum). The same is true here.

### 2. The Social Media Policy is Not Viewpoint Neutral

Even in a limited public forum, any speech restrictions must be viewpoint neutral; thus, the government must "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. Here, the record establishes that the Governor and his staff regularly discriminate against viewpoints critical of the Governor.

The policy against "repeated off-topic" comments cannot be seen as viewpoint neutral based on the policies and practices of the Governor's Office. First, as the Sixth Circuit has made clear, without "clear standards" given to a government official, a speech restriction in a limited public forum is open to attack "as subject to arbitrary enforcement." *M.A.L. v. Kincaid*, 543 F.3d 841, 848 (6th Cir. 2008). Indeed, giving decisionmakers the kind of unbridled discretion they have here grants them substantial power to "discriminate based on the content or viewpoint of the speech." *American Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 892-93 (6th Cir. 2012).

And that is precisely what the Governor and his staff have done, in the name of keeping his Twitter and Facebook posts "on-topic." For example, in one instance the press secretary informed colleagues: "Hey gang, **negative comments** seem to be really picking up on social media this afternoon. All help blocking these jokers ;) (when appropriate) much appreciated." Ex. 31, January 13, 2018 Maglinger Text (emphasis added). Moreover, the screenshots of blocked users that this Court ordered the Governor to produce reveal the disparity in the viewpoints suppressed. Plaintiffs received almost 1700 pages of screenshots revealing the speech that led to certain individuals being blocked. A careful review showed that nearly 90% of the messages (conservatively) were critical of the Governor, while at most 1% were supportive. (It was impossible to determine the remainder because the screenshots did not include enough context about the original tweet or post).

These statistics are not an accident. Discovery shows that the Governor and his staff intentionally target as "off-topic" comments that are critical of his administration or political views

the Governor shares or espouses. For example, the Governor produced in discovery a copy of the keyword "filter" he uses to flag Facebook posts for possible deletion and banning. Ex. 32, Facebook Filter. That filter targets a significant amount of constitutionally protected speech. It flags hundreds of words for further scrutiny, including: political issues with national significance (Trump, pardon, [tax] returns, [Roy] Moore, pedophile) or state-wide resonance (accreditation, cannabis, felon, legalize, marijuana, opium); mild insults that might be directed at the Governor or others (carpetbagger, dictator, weirdo, crook, jerk, narcissist, nimrod, prude, hypocrite, moron, cheat, thug); words with negative connotations that are likely to accompany a criticism of the Governor (worthless, stupid, joke, incompetent, scam, dopey); words associated with a woman's reproductive system (uterus, cervix, menstruation, womb); and a number of words that simply defy explanation (Colorado, king, cutting, destroy, stroke, vomit, strip, leper, booger, beer, steamy, organ). Given this seeming attempt to find and scrutinize comments that are likely to disagree with or criticize the Governor, it is hardly surprising to see such a wildly disproportionate percentage of blocked users espousing a viewpoint different from the Governor's. But it is unconstitutional.

The Governor's restriction on the use of profanity, likewise, constitutes viewpoint discrimination. Just last Term the U.S. Supreme Court struck down a ban on offensive trademarks, reiterating that "[s]peech may not be banned on the ground that it expresses ideas that offend." *Matal*, 137 S. Ct. at 1751; *see also FCC v. Pacifica Foundation*, 438 U.S. 726, 745 (1978) ("The fact that society may find speech offensive is not a sufficient reason for suppressing it."). And, crucially for this case, Justice Alito emphasized that "giving offense *is a viewpoint*." *Id.* at 1763 (plurality opinion) (emphasis added). Likewise, the Fifth Circuit recently struck down a similar policy allowing public officials to ban social media users for "inappropriate comments," holding that banning "based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate" is viewpoint discrimination. *See Robinson*, --- F.3d ----, 2019 WL 1594319, at *3.

22

### 3. The Governor's Policy Gives Employees Unfettered Discretion to Ban Speech.

The Governor's social media policy fails constitutional scrutiny in yet another way: it is so vague that it gives state actors a blank check to ban users for any conceivable reason. Time and again courts have held that this kind of effectively unfettered discretion is, itself, a violation of the First Amendment. *See, e.g.*, *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988) ("[P]lacing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."); *Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) ("[T]he danger of censorship and abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use.").

As the Sixth Circuit has observed, "even in limited public and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the First Amendment." *M.A.L.*, 543 F.3d at 848. "[T]he danger of such boundless discretion . . . is that the government may succeed in unconstitutionally suppressing particular protected speech by hiding the suppression from public scrutiny." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006). And that is precisely what has happened here. As catalogued above, several users have been blocked indefinitely for making substantive comments critical of the Governor that were deemed by his staff to be "off-topic" or "obscene."

The deposition testimony illustrates this problem. In one instance, a former employee who previously oversaw the Governor's communications office said any comment would be on-topic if it was something about Governor Bevin and was not profane. Ex. 33, Easley Dep. 59:4-5. But later in the deposition she acknowledges that a comment referencing an election of Matt Bevin would not be on-topic. *Id.* 63:4-7. Similarly, employees testified that comments specifically about medical marijuana would frequently lead to being blocked. Ex. 16, 49:17-23; Ex. 1, 34:3-12. This ambiguous and unbridled discretion directly led to discrimination based on viewpoint.

23

**III.   Even if the Governor's Social Media Blocking Policy is Facially Constitutional, the Blocking of Plaintiffs Violated their First Amendment Rights.**

As discussed, the Governor's social media policy is unconstitutional on its face because its standardless discretion allows for the content- and viewpoint-based restrictions—and unconstitutional prior restraints—in public fora where citizens come to interact with the Governor and other members of the public. But even if the policy were facially constitutional, the First Amendment still would not tolerate the application of the policy to Plaintiffs Morgan and Hargis on the facts of this case. *See Country Mill Farms, LLC v. City of E. Lansing*, 280 F. Supp. 3d 1029, 1042 (W.D. Mich. 2017) (a plaintiff may bring an as-applied challenge that "attacks the validity of the law as it has been applied to him or her by focusing on the acts that are the subject of the litigation").

First, Drew Morgan was blocked from the Governor's Twitter page because he posted several comments about the Governor's overdue property taxes on February 8, 2017. For example,

- In response to the Governor's tweet: "If we are able to be the best version of ourselves, it is going to take us doing simple things like living the golden rule #SOTC17 #WeAreKY", Mr. Morgan replied: "And paying our property taxes."

- In response to the Governor's tweet: "Take pride in your state. Take pride in your community," Mr. Morgan replied: "Take pride in paying the taxes on your house."

- In response to the Governor's tweet: "Charter schools are coming to Kentucky, and this would be good for the state," Mr. Morgan replied: "What would be better would be to stop cutting funding to schools and oh, yeah, pay your taxes to your house."

Ex. 7 at 6-7. The Governor's designated 30(b)(6) witness claims that no one in the Governor's office knows why Mr. Morgan was blocked for these comments, Ex. 9, 123:23-24, but there is only one plausible inference: he was blocked because he repeatedly criticized the Governor. His tweets were not profane, let alone obscene. And each was a direct response to the Governor's message raising a relevant and important matter of public concern. Mr. Morgan was thus singled out for both the content and viewpoint of his tweets. This makes his blocking unconstitutional regardless of the type of forum involved.

24

For over two years, Mr. Morgan has desired, but been unable, to engage in constitutionally protected political speech on the Governor's social media pages. Because he is blocked, Mr. Morgan cannot directly see the Governor's tweets or reply to the Governor's tweets. Ex. 6, 60:12-17. "No more is needed to violate the Constitution." *Knight*, 302 F. Supp. 3d at 577.

Similarly, Mary Hargis was blocked from the Governor's Facebook page for posting *a single comment critical* of one of the Governor's workforce development policies. Again, the Governor's office professes ignorance as to why Ms. Hargis was blocked. Ex. 9, 123:23-24. There is no evidence that Ms. Hargis's comment was obscene, abusive, or even "off-topic." Thus—and again—the only relevant inference is that Ms. Hargis was blocked because of her comment critical of the Governor. *See One Wisconsin Now*, 354 F. Supp. 3d at 956 ("[T]he only reasonable inference is that Vos blocked OWN because of its prior activity on his Twitter page."). That "constitutes black-letter viewpoint discrimination." *Davison*, 912 F.3d at 687. She, too, has desired, but been unable, to engage in constitutionally protected political speech—including participating in Governor Bevin's Facebook live video addressing her very own pension system.

For both Plaintiffs, the loss of First Amendment freedoms unquestionably constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, irreparable harm flows naturally from constitutional violations. *Doe v. Kentucky ex rel. Tilley*, 283 F. Supp. 3d 608, 615 (E.D. Ky. 2017).

## CONCLUSION

For the foregoing reasons, the Court should find the Governor's policies and practices of blocking individuals from his official social media pages are unconstitutional. Further, Plaintiffs have shown that they suffered irreparable harm, there is no adequate remedy at law, such a remedy is warranted, and it is in the public's interest to issue the injunction. Accordingly, the Court should enter the proposed Order attached hereto as Ex. 34.

Dated: April 30, 2019

Respectfully submitted,

s/ Corey M. Shapiro

| | |
|---|---|
| Corey M. Shapiro | Michael P. Abate |
| Heather L. Gatnarek | Casey L. Hinkle |
| ACLU OF KENTUCKY FOUNDATION, INC. | Andrea Aikin |
| 325 W. Main Street, Suite 2210 | KAPLAN JOHNSON ABATE & BIRD LLP |
| Louisville, Kentucky 40202 | 710 West Main Street, 4th Floor |
| (502) 581-9746 | Louisville, Kentucky 40202 |
| corey@aclu-ky.org | (502) 416-1630 |
| heather@aclu-ky.org | mabate@kaplanjohnsonlaw.com |
| | chinkle@kaplanjohnsonlaw.com |

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on April 30, 2019, I filed this Motion for Summary Judgment with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

M. Stephen Pitt
S. Chad Meredith
Matt F. Kuhn
Office of the Governor
700 Capital Ave., Suite 101
Frankfort, KY 40601
Steve.Pitt@ky.gov
Chad.Meredith@ky.gov
Matt.Kuhn@ky.gov

s/ Corey M. Shapiro
*Counsel for Plaintiffs*

26