UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT DIVISION

| | | |
|---|---|---|
| DREW MORGAN; and | § | |
| MARY HARGIS, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CASE NO. 3:17-cv-00060-GFVT |
| | § | |
| MATT G. BEVIN, in his official | § | *Filed Electronically* |
| capacity as Governor of Kentucky; | § | |
| *Defendant.* | § | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

> [T]his Court is convinced that Governor Bevin's use of privately owned Facebook Page and Twitter pages is personal speech, and, because he is speaking on his own behalf, even on his own behalf as a public official, "the First Amendment strictures that attend the various types of government-established forums do not apply."
>
> —*Morgan v. Bevin*, 298 F. Supp. 3d 1003, 1010–11 (E.D. Ky. 2018) (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2250 (2015)).

So declared this Court in its March 30, 2018 order denying the Plaintiffs' motion for a temporary injunction. The Court left for another day the ultimate question of whether the Plaintiffs had articulated a viable claim, but nonetheless announced its convictions that the First Amendment does not govern this case and that First Amendment forum analysis is wholly inapplicable. *See id.* at 1010. Since then, nothing has changed. Well, almost nothing. The only things that have changed are that the Plaintiffs have allowed the pleadings to close without amending their Complaint [DN #35 (setting Aug. 7, 2018 deadline)], thereby leaving their claims frozen as originally pled, and discovery has closed without the Plaintiffs having gathered any evidence to support their claims. Whereas the Plaintiffs were merely "unlikely to succeed on the merits of this

case" as of March 30, 2018, *Morgan*, 298 F. Supp. 3d at 1005, it is now clear that they *cannot* succeed on the merits.  Thus, the Defendant, Governor Bevin, moves this Court for summary judgment pursuant to Fed. R. Civ. P. 56, as well as dismissal for lack of subject-matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

This dispositive motion should be granted for three reasons.  First, this case does not present a justiciable case or controversy.  The Plaintiffs have suffered no injury in fact, and therefore have no standing.  Second, the Plaintiffs cannot prevail on the merits of their facial attack on the Governor's social media policy.  As this Court has already held, the Governor's Facebook and Twitter accounts are government speech, and therefore the Plaintiffs' First Amendment rights are not even implicated here.  Alternatively, even if the Court were to reverse course and decide that the Governor's social media accounts are some kind of forum rather than government speech, the Plaintiffs still could not prevail because the accounts cannot possibly be anything more than limited public fora, and the Governor's policy of blocking accounts that post obscene, abusive, and repeatedly off-topic comments is reasonable and viewpoint neutral.  Third, there is no evidence whatsoever supporting the Plaintiffs' as-applied challenges.

## **FACTS**

The Court is no doubt familiar with the pertinent facts in this case as a result of the prior briefing and evidentiary hearing in this matter.  The Governor sees no need to rehash all of the facts here.  Rather, he incorporates by reference the factual discussions from prior briefs and reiterates that social media networks like Facebook and Twitter have revolutionized the way that elected officials communicate with the public.  They allow the general public, *en masse*, to observe their officials in the performance of their duties and to see and hear messages directly from officials—often in real time—without those messages having to be filtered through third-party

2

media.   Indeed, this is the reason Governor Bevin maintains official Facebook and Twitter accounts—it allows him to communicate *his message* directly to the people without having to go through an intermediary.   [Ex. A, Maglinger Dep. at 52:2-5].   This provides an unprecedented level of transparency and information on the workings of government.

Unfortunately, some try to disrupt the flow of information by making obscene or abusive comments to elected officials' social media posts, or by appending repeated off-topic comments to them.   Such behavior effectively amounts to a heckler's veto.   It adds no value to public discourse and only distracts attention from the messages that officials desire to communicate. Thus, it should be no surprise that Governor Bevin blocks[1] accounts that are used in such disruptive manners.

The Plaintiffs, of course, contend that the Governor's policy of blocking accounts that make obscene, abusive, or repeated off-topic comments is a violation of the right to free speech under the First Amendment to the United States Constitution.   In evaluating this claim, it is important to remind the Court what it means—and does not mean—to be blocked.   The Plaintiffs want to create the impression that blocking an account is a draconian measure that inhibits individuals from exercising their First Amendment right to free speech.   But nothing could be further from the truth.   As this Court has already observed, "the term 'block' conjures an image much harsher than reality."   *Morgan*, 298 F. Supp. 3d at 1013.

One of the key points here is that "[n]o one is being blocked from speaking on Twitter or Facebook."   *Id.*   In fact, when the Governor's Office blocks an account, no *individuals* are blocked from doing anything.   The Governor's social media accounts can be viewed by any member of the

---

[1] Technically, Facebook allows users to be "banned" and Twitter allows users to be "blocked." For the sake of simplicity, this Response will refer to both as a "block."

public who has internet access, whether or not they even have Facebook or Twitter accounts.  [*See* Doc. 23 at 49:1-8, 62:24-63:3].  Moreover, when a Facebook account is blocked, that account can still be used to view the Governor's Facebook account, and it can even be used to share posts from the Governor's account.  [*See id.* at 32:23-33:2].  The only limitations are that it cannot be used to comment on posts on the Governor's Facebook account or send direct messages to the Governor's Facebook account.  [*Id.* at 33:3-4].  The Governor's Twitter account functions slightly differently in that it cannot be viewed from a blocked account, but the possessors of blocked accounts can still view the Governor's posts simply by logging out of their accounts.  [Ex. B., Morgan Dep. at 60:12-14].  In other words, when a Facebook or Twitter account is blocked, the individual or individuals associated with that account can still view the Governor's posts just like individuals who do not even have Facebook and Twitter accounts.  And the individuals associated with blocked accounts "are still free to post on their own walls and on friends' walls whatever they want about Governor Bevin."  *Morgan*, 298 F. Supp. 3d at 1013.  In short, blocking an account does not prohibit the *individual* associated with the account from doing anything.  It simply means that the blocked *account* has limited functionality when it comes to viewing or commenting on the Governor's social media accounts.  These points are undisputed.

In the same vein, it is important to understand that an individual whose account is blocked can continue interacting with the Governor's account just as they did before their account was blocked by simply creating a new account—which costs nothing.  The rules and user agreements governing Facebook and Twitter specifically allow individuals to have multiple accounts.  [*See* Doc. 23 at 40:24-25, 57:18-19].  In fact, both of the Plaintiffs have, at one time or another, had access to a second Facebook or Twitter account that they could have used to continue interacting with the Governor's accounts after being blocked.  [Ex. B, Morgan Dep. at 62:16-63:12; Ex. C,

Hargis Dep. at 47:22-48:6]. But they did not do so, which was *their* choice. They could also create new accounts and use those accounts to interact with the Governor's accounts, but they have not done so, which—again—is their choice. Simply put, nothing but their own intransigence prohibits them from continuing to interact with the Governor's social media accounts.

The Court should also take note of the fact that the Governor's Office is willing to unblock accounts—and has, in fact, done so—when the owner of the account requests to be unblocked and promises not to make obscene, abusive, or off-topic comments going forward. [Ex. A, Maglinger Dep. at 130:18-131:7; Ex. D, Brickman Dep. at 94:18-24]. The Plaintiffs are well aware that it is within their power to be unblocked, [Ex. B, Morgan Dep. at 73:4-77:11; Ex. C., Hargis Dep. at 43:13-44:15], and yet, neither they nor their attorneys have ever made such a request of the Governor's Office. It appears that what they want is not just to be unblocked, but to be unblocked *and* granted an unfettered right to make whatever comments they want on the Governor's social media posts. In other words, they want a court-sanctioned heckler's veto.

The Court was correct to deny the Plaintiffs' request for preliminary injunctive relief that would have granted a temporary heckler's veto. And nothing has changed since then except that the completion of discovery has confirmed that the Plaintiffs' claims are meritless.

## **ARGUMENT**

It is time to put an end to this case, which is really nothing more than an attempt to wrest control over the Governor's social media accounts away from the *Governor* and give it to those who desire to exercise a heckler's veto by drowning out the Governor's messages with a cacophony of obscene, abusive, or otherwise off-topic comments. As an initial matter, the Plaintiffs lack standing because they have not suffered an actual, concrete injury. Therefore, the case should be dismissed for lack of subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). But

even if the Court were to reach the merits, the Plaintiffs still cannot prevail.  There are no genuine issues of material fact, and Governor Bevin is entitled to judgment as a matter of law as to the Plaintiffs' claims for facial and as-applied relief under the First Amendment.  *See* Fed. R. Civ. P. 56(a).

## I.      The Plaintiffs lack standing because they have suffered no injury in fact.

Federal courts do not exist to be "free-range problem solvers," *Hearring v. Sliwowski*, 806 F.3d 864, 868 (6th Cir. 2015), nor do they exist to answer abstract academic questions or serve as "judicial versions of college debating forums," *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982).  Instead, they exist solely to decide actual cases or controversies.  *See* U.S. Const. art III, § 2.  "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)).  Without standing, there is no case or controversy.  And without a case or controversy, there is no subject-matter jurisdiction.  *See id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)).  Here, the Plaintiffs are unable to establish that they have standing.

In order to establish standing, a plaintiff must demonstrate that he or she has suffered an injury.  But not just any theoretical injury will do.  Instead, the plaintiff's injury "must be 'concrete, particularized, and actual or imminent.'"  *Id.* at 409 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)); *see also Spokeo, Inc. v. Robins*, __ U.S. __, 136 S. Ct. 1540, 1548 (2016) (To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992))).  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"

*Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1).  "Particularization is necessary to establish injury in fact, but it is not sufficient.  An injury in fact must also be 'concrete.'"  *Id.*  And, in order to be "concrete," an "injury must be 'de facto'; that is, it must actually exist."  *Id.* (citing Black's Law Dictionary 479 (9th ed. 2009)).  This means that there must be a real, as opposed to abstract, harm.  *Id.* (citing Webster's Third New International Dictionary 472 (1971); Random House Dictionary of the English Language 305 (1967)).  In this case, however, no such harm exists.  The Plaintiffs have not personally been impacted in any real way.  They have made no "factual showing of perceptible harm."  *Lujan*, 504 U.S. at 566.

The harm that Plaintiff Drew Morgan alleges is that he is unable to speak to the Governor on the Governor's official Twitter account.  [*See* Ex. B, Morgan Dep. at 60:10-17, 61:3-6, 150:15-151:5, 158:2-18].  As an initial matter, Mr. Morgan does not have a right to an audience with the Governor on Twitter, nor does the Governor have any obligation to receive Mr. Morgan's comments.  *See Minn. State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 286 (1984); *Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 466 (1979).  But, setting this aside, the fact of the matter is that Mr. Morgan is not, in any realistic sense, prohibited from communicating with the Governor.  Indeed, notwithstanding his claim to the contrary, he is not even prohibited from communicating with the Governor *on the Governor's official Twitter account*.  The following testimony from his deposition is revealing:

> Q:    Mr. Morgan, how has being blocked harmed you?
>
> A:    I can't engage with the Governor.  I can't see his posts unless I log out of my Twitter account.  Even if I log out, I can't reply to his posts once logged out.  Currently I cannot see nor reply to them if I'm logged into my Twitter account.  I can't engage with my Governor as his constituent.
>
> Q:    Well, that's not true, though, literally, is it?

A:     On Twitter it is true.

Q:     You can write letters to the Governor's office, right?

A:     I can.

Q:     You can call the Governor's office, right?

A:     I could.

Q:     You could send messages through Facebook, right?

A      I could.

Q:     You could post comments on Facebook posts, correct?

A:     I could.[2]

Q:     You could write op-eds in newspapers, couldn't you?

A:     I doubt they would publish it, but I could attempt to write a letter to the editor or something.

. . .

Q:     You could organize a rally or a protest, couldn't you?

A:     I could.

Q:     You could give a speech in a public place, couldn't you?

A:     I could.

Q:     But you haven't done any of that, have you?

A:     I have not.

Q:     Why not?

A:     I chose to engage with him on Twitter.  That was my chosen format and forum.

---

[2] Mr. Morgan's Twitter account is blocked, but not his Facebook account.  Thus, there are no limitations on his ability to interact with the Governor's Facebook account.

[Ex. B, Morgan Dep. at 60:10-62:2].  Mr. Morgan also admitted that he remains free to comment on posts on the Governor's personal—as opposed to official—Twitter account.  [*Id.* at 152:10-21].  And, even more importantly, he admitted that he actually *could* communicate directly with the Governor's Twitter account simply by creating another Twitter account for himself.  [*Id.* at 71:17-72:13].  His only response to this point was that he "shouldn't have to create a second account." [*Id.* at 72:12-13].  On top of that, he also admitted that he indeed had access to a second Twitter account until recently, and that he could have used that account to do the things that he claims he is unable to do because the Governor blocked his other account.  [*Id.* at 62:16-63:20].

In light of these facts, it is difficult to understand how anyone could say with a straight face that Mr. Morgan has, in any realistic sense, suffered an injury.  He is free to engage in whatever public discourse he wants concerning the Governor—and, contrary to his claim to injury, he even has the ability, if he chooses to exercise it, to engage in public discourse directly on the Governor's Twitter account notwithstanding the fact that his account has been blocked.

The same is true of Plaintiff Mary Hargis.  Ms. Hargis has been blocked on Facebook, and, like Mr. Morgan—who is blocked on Twitter—she claims to be suffering harm due to her inability to voice her opinion.  [*See* Ex. C, Hargis Dep. at 27:22-28:4, 29:20-30:10].  But, also like Mr. Morgan, she admits that she can call the Governor's office, write letters to the Governor's office, visit the Governor's office, send e-mail to the Governor's office, make speeches about the Governor, make comments on the Governor's Twitter account, make her own Twitter posts about the Governor, and make her own Facebook posts about the Governor.  [*Id.* at 26:4-27:17, 37:2-38:1].  And Ms. Hargis also acknowledged that she could continue interacting directly with the

Governor's Facebook page simply by creating or using another account.[3]  [*Id.* at 45:18-25].  But, tellingly, she testified that she has not done so because she "just [has] no interest in doing anything like this."  [*Id.* at 47:6-7].

Several other facts underscore the lack of real harm here.  For example, the Plaintiffs were recruited by the ACLU.  [Ex. B, Morgan Dep. at 95:13-23; Ex. C, Hargis Dep. at 76:10-86:10].  This is not a case where individuals suffered an injury and then sought out legal representation for the purpose of remedying that injury.  In fact, the purported harm is so trivial that Ms. Hargis did not even know she had been blocked for roughly a year-and-a-half.  She was blocked in December of 2015, [Ex. D, Brickman Dep. at 99:10-12], and she did not even know she had been blocked until the ACLU contacted her about becoming a Plaintiff in this case in July 2017, [Ex. C, Hargis Dep. at 82:5-6, 85:2-13].  Similarly, Mr. Morgan was blocked in February 2017, but did not file suit until July 2017.  [Ex. B., Morgan Dep. at 78:18-25].  And the evidence further shows that even when he decided to become a Plaintiff, it was not because he desired to vindicate his own rights, but because he wanted to help the ACLU.  Specifically, he told a friend via text message that becoming a plaintiff in this case "just seemed like the right thing to do to help [the ACLU] get the lawsuit filed . . . ."  [Ex. B, Morgan Dep. at 88:3-11 & Ex. 6].[4]

This is not a case where the Plaintiffs have alleged any *real* detriment to their constitutional rights.  Rather than raising a real, concrete injury, they have done nothing more than raise their personal displeasure with having their accounts blocked by the Governor's Facebook and Twitter

---

[3] Like Mr. Morgan's access to a second Twitter account, Ms. Hargis had access to a second Facebook account until recently.  [Ex. C, Hargis Dep. at 93:12-94:17].

[4] The fact that the Vice Chair of the Kentucky Democratic Party—who has never been counsel of record in this case—showed up to observe the deposition of the Governor's Social Media Director also suggests that this case is about something other than a legitimate attempt to vindicate First Amendment rights.  [*See* Ex. D, Brickman Dep. at 112:1-5].

accounts.  This is not sufficient to confer standing on the Plaintiffs.  *See, e.g., New Creation Fellowship of Buffalo v. Town of Cheektowaga*, 164 F. App'x 5, 7 (2d Cir. 2005) (holding that minor inconveniences do not satisfy the injury-in-fact requirement for Article III standing (citing *Ingraham v. Wright*, 430 U.S. 651, 674 (1977))).  "Were the federal courts merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding, the concept of 'standing' would be quite unnecessary." *Valley Forge Christian College*, 454 U.S. at 473.  But standing is a necessary concept.  "The exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it extends, is . . . restricted to litigants who can show 'injury in fact' resulting from the action which they seek to have the court adjudicate." *Id.*  Here, however, the Plaintiffs here have suffered no real injury in fact.  To hold otherwise would be to broaden the concept of standing to the point where anyone could have standing to sue based on trivial annoyances or grievances.  The federal courts obviously do not exist to adjudicate such matters.  Accordingly, this case should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

## II.  The Plaintiffs cannot prevail on their facial claim.

Even if the Court makes its way past standing, which it should not do, the Plaintiffs still cannot prevail on the merits of their claims.  The Complaint alleges that the Governor's policy of blocking accounts that leave obscene, abusive, or repeated off-topic comments is facially unconstitutional.  According to the Plaintiffs, the Governor's Facebook and Twitter accounts are designated public fora, and therefore, any restrictions on the public's ability to access or make comments on those accounts must be subject to strict scrutiny.  This is wrong for two reasons:  (1) as this Court has already held, the Governor's Facebook and Twitter accounts constitute government speech, which means that the Plaintiffs' First Amendment rights are not even

11

implicated; and (2) even if the Court reverses course and concludes that the Governor's Facebook and Twitter accounts are subject to forum analysis, the evidence shows that they cannot possibly be considered anything more than limited public fora, and the Governor's policy of blocking accounts that post obscene, abusive, and repeatedly off-topic comments is reasonable and viewpoint neutral.

### A. The Governor is entitled to judgment because, as the Court has already held, the Governor's social media accounts constitute government speech.

In denying the Plaintiffs' Motion for Preliminary Injunction, the Court concluded that First Amendment forum analysis does not apply to the Governor's Facebook and Twitter accounts because they are government speech.  Specifically, the Court held that "Governor Bevin's use of privately owned Facebook Page and Twitter pages is personal speech, and, because he is speaking on his own behalf, even on his own behalf as a public official, 'the First Amendment strictures that attend the various types of government-established forums do not apply.'"  *Morgan*, 298 F. Supp. 3d at 1010-11 (quoting *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, __ U.S. __, 135 S. Ct. 2239, 2250 (2015)).  The Court was correct in this assessment, and nothing has changed since then.  Therefore, the same holding should still apply.

This is not a situation in which a government official has established a space for others to speak on the topics of their choosing.  Rather, the Governor's Facebook and Twitter accounts exist so that he can communicate regarding the messages that he wants to discuss.  [Ex. A, Maglinger Dep. at 52:2-5; Ex. D, Brickman Dep. at 128:17-21].  As the Court held previously, the significance of this is that the Governor is "not barred by the Free Speech Clause from determining the content of what [is communicated on his social media accounts]."  *Walker*, 135 S. Ct. at 2245.  "That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech."  *Id.*  In other words, "[w]hen the government speaks, for

12

instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Morgan*, 298 F. Supp. 3d at 1011 (quoting *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000)).

The Plaintiffs, however, want carte blanche authority to espouse whatever messages *they want* on the Governor's Facebook and Twitter accounts—be they obscene, abusive, or off-topic. In other words, they want the freedom to hijack the Governor's social media accounts with their own messages. But, as the Court correctly held last year, the First Amendment gives them no such right. The Governor is not obligated to listen to their messages, nor is he obligated to allow them to take over his communications platform. *See id.* at 1011. "Governor Bevin has chosen to effectively, 'ignore' those on Facebook he deems are not following the line of conversations he has decided to start on Facebook," *id.* (citing *Ark. State Highway Emp.*, 441 U.S. at 466), and nothing in First Amendment jurisprudence prohibits that, *see id.*

The Governor could have set up his social media accounts to give the public the kind of free-wheeling access that the Plaintiffs are seeking, but he deliberately chose not to do so. Instead, he set them up to communicate *his messages*. As the Court found last year:

> Governor Bevin's Twitter and Facebook accounts are a means for communicating his own speech, not for the speech of his constituents. Governor Bevin has made a series of decisions in setting up his official Facebook and Twitter accounts that indicate he intended them to be his own speech. First, his intended purpose for the accounts was to "communicate his vision, policies, and activities to constituents and receive feedback from them on the specific topics that he chooses to address in his posts." [R 11 at 3.] He never intended his Facebook or Twitter accounts to be like a public park, where anyone is welcome to enter and say whatever they want; he has a specific agenda of what he wants his pages to look like and what the discussion on those pages will be. Further, individuals cannot directly post on his account. [R. 23 at 4.] Only

13

he posts to his own account and users are permitted to comment on whatever post he has written.   [Id.]   Governor Bevin has an automatic filter set up so that expletives and spam comments are not posted, and he does not allow comments on his page that are "obscene, abusive, clearly off topic or spam."  [R. 11 at 3.]  If he wanted a truly open forum where everyone could post or comment, he could have set up his accounts to allow that, but he did not.  And the First Amendment does not require him to do so.

*Id.* at 1011-12.  All of this is still true, and it all still demonstrates that the Governor's Facebook and Twitter accounts are government speech.

As the speaker who is choosing the messages to be communicated through his Facebook and Twitter accounts, the Governor has interests of his own at stake here.  And those interests would be harmed—and probably even destroyed—if the Plaintiffs were to prevail here.  Specifically, if the Governor were prohibited from blocking accounts that are used to make obscene, abusive, or repeated off-topic comments on his social media posts, then his communications would be deluged by such comments.  His ability to communicate his chosen messages would be undermined as his posts would quickly be hijacked by those who want to distract attention away from the Governor's messages.  This would add no value whatsoever to the public discourse and would likely lead to less communication with the public.  In fact, this has already happened in some parts of the country.  For example, the city of Redondo Beach, California, decided to abandon its Facebook account in 2010 over its uncertainty as to whether it had authority to police public comments on the account.  *See* Debra Cassens Weiss, *California Town Abandons Facebook Page Amid Legal Concerns*, ABA J. (Aug. 24, 2010), *available at* http://www.abajournal.com/news/article/california_town_abandons_facebook_page_amid_legal _concerns.

Suppressing speech and diminishing the free flow of information and ideas obviously is not consistent with the First Amendment.  But that would likely be one of the real-world

consequences if the Plaintiffs prevail.  In other words, the Plaintiffs' position will lead to a proliferation of hecklers' vetoes as commenters attempt to stop the flow of information from public officials' social medial accounts by hijacking them with obscene, abusive, and off-topic comments. Fortunately, the Court has already held that the law does not give them the right that they seek, and there is no reason that the Court should reverse course and hold otherwise.

> **B. Even if the Court reverses course and finds that the Governor's social media accounts are susceptible to forum analysis, the Governor is still entitled to judgment because his accounts cannot be anything more than limited public fora.**

Even if the Court were to change its mind and conclude that the Governor's Facebook and Twitter accounts are susceptible to forum analysis rather than being government speech, the Plaintiffs still would not be able to prevail.  They contend that the Governor's social media accounts are designated public fora, but the evidence does not support that claim.

"The government creates a designated forum when it opens a piece of public property to the public at large, treating [it] as if it were a traditional public forum."[5]  *Miller v. City of Cincinnati*, 622 F.3d 524, 534 (6th Cir. 2010) (citing *Parks v. Finan*, 385 F.3d 694, 695-96, 699 (6th Cir. 2004)).  In other words, designated public fora are public spaces that are not thought of as traditional public fora, but have nevertheless been opened for the same unfettered access and "indiscriminate use by the general public."  *Perry Educ. Ass'n*, 460 U.S. at 47.

A designated public forum is not created "by inaction or by permitting limited discourse." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985).  Instead, it is

---

[5] The category of traditional public fora is limited to public spaces like streets and parks, "which 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).

only created by intentional conduct on the part of the government.  *See id.*  Accordingly, courts look "to the policy and practice of the government to ascertain whether it intended to [create a designated public forum]."  *Id.* (citing *Perry Educ. Ass'n*, 460 U.S. at 47).  The Sixth Circuit has, at times, viewed the analysis through the lens of two factors:  (1) whether access to the public property is generally available to the public, or whether speakers must first obtain permission in order to access the property; and (2) whether restrictions on expressive activity are designed to preserve the forum's intended purpose, or whether they are more akin to censorship in disguise. *See United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Regional Transit Authority*, 163 F.3d 341, 351-52 (6th Cir. 1998); *see also Putnam Pit, Inc. v. City of Cookeville*, 221 F.3d 834, 843-44 (6th Cir. 2000) (quoting *UFCW*, 163 F.3d at 352).  More recently, the Sixth Circuit has simply emphasized the need to determine governmental intent by looking to the government's policy and practice with respect to the forum.  *See Miller*, 622 F.3d at 534 (quoting *Kincaid v. Gibson*, 236 F.3d 342, 349 (6th Cir. 2001)).  But, no matter how it is formulated, "[g]overnmental intent is the 'touchstone'" of the analysis.  *Id.* (quoting *Kincaid*, 236 F.3d at 348-49).  And, under this analysis, courts will not find the creation of a designated public forum absent clear intent.  *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 270 (1988) (citing *Cornelius*, 473 U.S. at 802).

With regard to the Governor's Facebook and Twitter accounts, the circumstances do not show *any* intent to create a designated public forum, much less a *clear* intent to do so.  Those accounts have never been available to the public for the same kind of unfettered, indiscriminate use as a traditional public forum.  For example, members of the public cannot create their own posts on the Governor's accounts. [Doc. 11-1].  Facebook has an option that would allow members of the public to do so, but that option has *always* been disabled precisely because the Governor

does not want members of the public using his account to post their own messages.  Moreover, members of the public only have limited ability to make comments on the Governor's posts.  The first limitation on the public's ability to make comments is the use of the filtering mechanism on Facebook.  [Ex. A, Maglinger Dep. at 65:15-16].  This mechanism filters out and prohibits the posting of any comments that contain certain words that are input by the Governor's Office.  [*Id.* at 66:1-4; Doc. 11-1].  The specific trigger words in the filter are aimed at stopping obscene, abusive, and off-topic comments.  In a sense, a would-be commenter must first get permission to make a comment by submitting a proposed comment that satisfies the requirements of the filter.  And even if a comment makes it past the filter and appears beneath one of the Governor's posts, it is still subject to removal if it is obscene, abusive, or off-topic.  [Ex. D, Brickman Dep. at 41:7-8].  This policy has been enforced since the inception of the Governor's Facebook and Twitter accounts, [*id.* at 41:11-13], and it is a policy that is aimed not at censorship, but at preserving the fora for their intended use of communicating discrete messages to constituents and receiving feedback on the specific topics of those messages.  Thus, it is the type of policy that evidences an intent *not to create* a designated public forum.  *See UFCW*, 163 F.3d at 352.

There is no evidence supporting the Plaintiffs' contention that the Governor's Facebook and Twitter accounts are designated public fora.  The Plaintiffs are simply unable to demonstrate a clear intent on the Governor's part to create designated public fora.  Instead, the Governor's Facebook and Twitter accounts cannot be considered anything more than limited public fora, and the restrictions on comments easily meet the test for constitutionality in that type of forum.

A limited public forum is "a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects."  *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (citing *Perry Educ. Ass'n*, 460 U.S. at 46 n.7).  "When the State establishes a limited public

17

forum, the State is not required to and does not allow persons to engage in every type of speech." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001). Instead, the government can reserve its forum "for certain groups or for the discussion of certain topics." *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). This is precisely what the Governor has done with respect to his Facebook and Twitter accounts. Specifically, he has reserved it for discussion of the topics on which he chooses to post. Thus, his Facebook and Twitter accounts should be classified—at most—as limited public fora, and should be evaluated under no more stringent constitutional standard than the one that applies to such fora.

Government restrictions on limited public fora are not subject to the exacting standard of strict scrutiny. Instead, such restrictions "must not discriminate on the basis of viewpoint, and [they] must be reasonable in light of the purpose served by the forum." *Good News Club*, 533 U.S. at 106-07 (quotations and citations omitted). The restrictions at issue in this case easily satisfy this standard. The filter and the policy against obscene, abusive, and off-topic comments apply equally to all comments without regard to the viewpoints expressed in them. They are the epitome of viewpoint-neutral restrictions. And they have been enforced as such. As explained by the Governor's Chief of Staff, Blake Brickman, if a comment expresses support for the Governor or his policies, but violates the social media policy, the account making the comment will be blocked—which has happened. [Ex. D, Brickman Dep. at 127:5-9]. Likewise, negative comments that violate the social media policy are also blocked. [*Id.* at 127:10-15]. Thus, the viewpoint expressed in a comment has no bearing on whether it will be blocked.

These parameters are reasonable. They are nothing more than modest efforts to preserve the Governor's social media accounts for their intended functions by preventing them from being hijacked by those who would spam them with repeated off-topic comments or obscenities. The

reasonableness of these restrictions is underscored by the breadth of alternative options for communication that are unaffected.  For example, as the Plaintiffs admit, they can post messages about the Governor on their own social media accounts; they can create additional Facebook and Twitter accounts and use those accounts to continue making comments on the Governor's accounts; and they engage in all the traditional methods of speaking with regard to elected officials, such as writing letters to the editors of newspapers, holding rallies in public parks, and writing letters to the Governor.  Finally, the reasonableness of the restrictions is also highlighted by comparing the orderly exchange of information that the restrictions help to achieve with the complete disorder that would occur in their absence.  Without these restrictions, the communicative value of Facebook and Twitter would be greatly diminished as obscene and off-topic comments would quickly obscure the Governor's intended communications and distract the public's attention to different matters.  In short, without the ability to prohibit obscene, abusive, and off-topic comments, it would be much more difficult for the Governor to effectively communicate with constituents through social media platforms, and it would likewise be more difficult for him to receive pertinent feedback on the specific issues on which he seeks to communicate with constituents.

The recent case of *Davison v. Plowman*, 247 F. Supp. 3d 767 (E.D. Va. 2017), *aff'd*, 715 F. App'x 298 (4th Cir. 2018), illustrates the point that the accounts are no more than limited public fora.  In that case, the court considered the constitutionality of Loudoun County, Virginia's social media policy and its application by the Loudoun County Commonwealth's Attorney.  Loudoun County's social media policy, much like the Governor's in this case, prohibited comments that were "clearly off topic."  *Id.* at 772.  The Defendant, Loudoun County's Commonwealth's Attorney, blocked the plaintiff after he left a series of off-topic comments on the defendant's

Facebook page. *See id.* at 774. The court concluded that the defendant's Facebook account was a limited public forum because the policy against "clearly off topic" comments made it "clear that it was Defendant's role to select 'matters of public interest' for public discussion." *Id.* at 776 (quoting *Am. Civil Liberties Union v. Mote*, 423 F.3d 438, 445 (4th Cir. 2005)). After reaching that conclusion, and also reaching the conclusion that the plaintiff's comments were in fact off-topic, the court addressed whether the "clearly off topic" restriction met constitutional muster. The court had little trouble concluding that it did. The court found that prohibiting off-topic comments "is self-evidently viewpoint neutral." *Id.* at 777. It also noted that prohibiting off-topic comments is "a common restriction among limited public forums." *Id.* (citing *Perry Educ. Ass'n*, 460 U.S. at 71 [*sic*] n.7). And the court further found that the "clearly off topic" restriction "was reasonably related—indeed, integral—to the forum's purpose." *Id.* The court added:

> As discussed above, the Social Media Comments Policy contemplated that Defendant would set the agenda, and that interested parties would participate in moderated discussion regarding the selected topics. The "clearly off topic" restriction served to limit discussion to those matters presented and to thus preserve the forum for its intended purpose.

*Id.*[6]

Exactly the same reasoning applies to the comment limitations on the Governor's Facebook and Twitter accounts. In fact, this is the only reasoning that makes sense. It would not be in keeping with the purposes of those accounts to label them as designated public fora and require them to be open for the same kind of unfettered public access as traditional public fora. As discussed above, the Governor's Facebook and Twitter accounts exist for the sole purpose of communicating the Governor's vision, policies, and activities to constituents and, in turn, allowing

---

[6] The court further found that the "clearly off topic" restriction was not unconstitutionally vague. *See Davison*, 247 F. Supp. 3d at 778.

constituents to provide feedback—both positive and negative—on the specific topics addressed by the Governor.  If the Plaintiffs are correct that the Governor cannot prohibit off-topic comments, then the purpose and communicative value of his social media accounts will be lost; the Governor's message will quickly be drowned out by spam and off-topic comments.  This would not be good for the public, and it would be especially bad for the interests protected by the First Amendment.

The Supreme Court explained this dynamic in *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666 (1998).  The question in *Forbes* was whether a public broadcaster had violated a congressional candidate's First Amendment rights by excluding him from a televised debate.  The Supreme Court held that the debate was a nonpublic forum from which the candidate was properly excluded on the basis of a reasonable, viewpoint-neutral exercise of journalistic discretion.  *See id.* at 676.  The Court noted that any other conclusion would actually harm the interests protected by the First Amendment.  Specifically, it stated:

> Were it faced with the prospect of cacophony, on the one hand, and First Amendment liability, on the other, a public television broadcaster might choose not to air candidates' views at all.  A broadcaster might decide "'the safe course is to avoid controversy,' . . . and by so doing diminish the free flow of information and ideas."  In this circumstance, a "[g]overnment-enforced right of access inescapably 'dampens the vigor and limits the variety of public debate.'"
>
> . . . A First Amendment jurisprudence yielding these results does not promote speech but represses it.

*Id.* at 681-82 (citations omitted).

The same logic applies here.  If elected officials' Facebook and Twitter accounts are designated public fora, then officials who have such accounts will be faced with the prospect of either adopting restrictions that might not pass strict scrutiny, or else allowing a distracting, unproductive cacophony of off-topic comments.  In the face of these options, many officials might

simply choose to shut down their social media accounts altogether, thereby engaging in *less* communication with the public.

Fortunately, in the interest of protecting and facilitating the free and orderly flow of information, the law permits reasonable, viewpoint-neutral restrictions on the public's ability to comment on public officials' social media posts. And those are precisely the types of restrictions that the Governor has placed on the public's ability to comment on his Facebook and Twitter accounts. Thus, even if the Court were to evaluate the Governor's Facebook and Twitter accounts under forum analysis—which it should not do—the Governor's policy of blocking accounts that post obscene, abusive, or repeated off-topic comments is not facially unconstitutional. No matter whether those accounts are viewed as government speech or fora, the Governor's policy is squarely within the bounds of what is permitted by the law.

### III.     The Plaintiffs cannot prevail on their as-applied claims either.

The Plaintiffs' as-applied claims ask whether the Governor's social media policy has been applied to them, in particular, in such a manner as to violate their constitutional rights. The Plaintiffs cannot possibly prevail on this claim because they have no evidence whatsoever to support it. First, because the Governor's Facebook and Twitter accounts are government speech, the Plaintiffs cannot prevail because their First Amendment rights are not implicated. Second, even if one were to assume for the sake of argument that the Governor's Facebook and Twitter accounts are limit public fora rather than government speech, the Plaintiffs still could not prevail because there is no evidence whatsoever showing that they were blocked due to their viewpoints.

Because the Plaintiffs waited so long to file their lawsuit, no one in the Governor's Office has any recollection of why they were blocked. [Ex. D, Brickman Dep. at 123:23-24]. Mr. Morgan has identified the Twitter comments that immediately preceded his being blocked, but those

comments were not related to the topics of the Governor's posts on which he was commenting. [Ex. B, Morgan Dep. at 19:14-21, 22:19-24, 24:2-9]. Thus, the evidence shows that he was blocked for being in violation of the social media policy. With respect to Ms. Hargis, however, there is absolutely no evidence whatsoever. In the absence of any evidence, she cannot possibly meet her burden of proving that the social media policy was applied to her unconstitutionally.

## **CONCLUSION**

The Plaintiffs have not suffered any real harm. Neither their rights nor their lives have been impacted in any appreciable way by the fact that their social media accounts have been blocked by the Governor's social media accounts. Rather than presenting the Court with an actual case or controversy, they have presented—at most—a mere abstract, academic curiosity. But federal courts do not exist to answer such questions. They exist to adjudicate real cases or controversies involving real harm that has real impact on real people. Nothing of the sort is at stake here. What is really at stake is that a group of people simply do not like—but are not actually harmed by—the Governor's practice of blocking those social media accounts that are used to leave obscene, abusive, or repeated off-topic comments on his accounts. For whatever reason, these individuals believe that they and others should be able to espouse any message they want on the Governor's social media accounts without the Governor having *any ability* to control that message. This is nonsense. The Governor's social media accounts exist for the purpose of communicating on the topics of the Governor's choosing, and within the standards of decency of his choosing. They do not exist for the purpose of allowing others to exercise a heckler's veto over his messaging—which is what will happen if the Governor is not allowed to set parameters on comments and block accounts that go outside those parameters.

In the grand scheme of things, social media is still in its infancy.  Given this fact, the Court should continue to heed Justice Alito's advice to "proceed circumspectly."  *Packingham v. North Carolina*, __ U.S. __, 137 S. Ct. 1730, 1744 (2017) (Alito, J., concurring in the judgment). Because the full dimensions and vast potential of the Cyber Age cannot yet be fully appreciated, *id.*, this Court should be wary of making broad First Amendment pronouncements that could lead to unintended consequences.  The Court should continue to be mindful of the fact that creating a First Amendment right to use a particular social media account to comment on a public official's social media account could lead to an unmanageable cacophony of noise that would discourage public officials from using social media.  *See Ark. Educ. Television Comm'n*, 523 U.S. at 681-82. The result could very well be the end of the unprecedented level of transparency and access to government that has been provided by social media.

For the foregoing reasons the Court should either dismiss this case for lack of standing, or else grant summary judgment in favor of the Governor.  The First Amendment does not guarantee anyone the right to a heckler's veto.

Respectfully submitted,

/s/ S. Chad Meredith
M. Stephen Pitt
S. Chad Meredith
Matthew F. Kuhn
Office of the Governor
700 Capital Avenue, Suite 101
Frankfort Kentucky  40601
(502) 564-2611 (phone)
Steve.Pitt@ky.gov
Chad.Meredith@ky.gov
Matt.Kuhn@ky.gov

*Attorneys for Governor Bevin*

24

## <u>CERTIFICATE OF SERVICE</u>

A true copy of the foregoing will be served electronically via ECF upon all counsel of record on this the 30th day of April, 2019.

/s/ S. Chad Meredith
Attorney for Governor Bevin
